RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0097p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

HOLLY SCHULKERS, individually and as mother and next of friend to B.R.B., B.O.B., and A.M.S; DAVID SCHULKERS, individually and as father and next of friend to E.E.S. and E.M.S.,

  *Plaintiffs-Appellees*,

  *v.*

ELIZABETH KAMMER, ALISON CAMPBELL, and KARA [UNKNOWN],

  *Defendants-Appellants*.

No. 19-5208

────────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:17-cv-00076—William O. Bertelsman, District Judge.

Argued:  December 6, 2019

Decided and Filed:  March 30, 2020

Before:  DAUGHTREY, CLAY, and GRIFFIN, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:**  S. Chad Meredith, COMMONWEALTH OF KENTUCKY, Frankfort, Kentucky, for Appellants.  Paul J. Hill, Ft. Mitchell, Kentucky, for Appellees.  **ON BRIEF:**  David Brent Irvin, CABINET FOR HEALTH AND FAMILY SERVICES, Frankfort, Kentucky, for Appellants.  Paul J. Hill, Ft. Mitchell, Kentucky, for Appellees.

———————————

**OPINION**

———————————

CLAY, Circuit Judge. Defendant social workers employed by the Kentucky Cabinet for Health and Family Services interlocutorily appeal the district court's order denying their motion for summary judgment on qualified immunity grounds. Plaintiffs, a family consisting of two parents and five children, assert that Defendants violated their Fourth Amendment rights by subjecting four of the children to warrantless in-school interrogations without reasonable suspicion of child abuse. Plaintiffs also assert that Defendants violated their Fourteenth Amendment rights by requiring Plaintiffs to adhere to a "Prevention Plan," which constrained the plaintiff-mother's ability to be alone with her children for approximately two months without any question as to her parental fitness and without any procedural protections. For the reasons that follow, we affirm in part and reverse in part the district court's order.

**STATEMENT OF FACTS**

**A. A.M.S.'s Birth and the Initial Drug Test**

In February 2017, St. Elizabeth Medical Center, Inc. ("St. Elizabeth") admitted Plaintiff Holly Schulkers ("Holly") for a scheduled labor induction. Prior to giving birth, St. Elizabeth tested a sample of Holly's urine, which returned a "presumptive positive" result for opiates. Holly did not consent to the urine testing, and she was never told that the testing would be performed.

Approximately sixteen hours after the urine testing, Holly gave birth to her newborn child, A.M.S., without complications. Holly breastfed A.M.S. within the first hour of giving birth. The hospital pediatrician examined A.M.S. and advised Plaintiff David Schulkers ("David") that the hospital intended to discharge Holly and A.M.S. later that afternoon.

Shortly after the pediatrician left Holly's hospital room, Anne Marie Davis, a care coordinator and social worker with St. Elizabeth, visited Holly in her hospital room. Davis informed Holly that her urine had tested positive for opiates, and asked Holly if she was taking

any medications. Holly responded that she had recently taken some of her daughter's prescription cough medicine and that she had eaten a bag of chips that contained poppyseeds prior to giving birth. Holly was unable to confirm if the cough medicine contained codeine, which Davis stated could cause a positive result for opiates. Holly inquired whether her consumption of poppyseed chips prior to giving birth could have caused the false positive. Davis responded that it could not. Davis informed Holly that A.M.S.'s umbilical cord was also tested, but the results were still pending. Davis further informed Holly that depending on the results of the umbilical-cord testing, the hospital might contact the Kentucky Cabinet for Health and Family Services ("CHFS").[1]

St. Elizabeth did not perform a confirmatory test, known as a "Drug of Abuse with Reflex to Confirmation" test, on Holly's first urine sample even though that sample was still available. Before receiving the results for the umbilical cord testing, Davis charted that Holly had a positive drug screen and indicated that Holly had a "substance use disorder" even though St. Elizabeth's records indicated that Holly's prenatal lab tests had all been negative for substance abuse and that she had no history of drug use.

At some point after speaking with Holly but before receiving the results for the umbilical cord testing, Davis reported to the CHFS via a web-based reporting system that Holly had a positive drug screen. The transmission stated:

> Holly [Schulkers] delivered baby on 2/9. [Urinary Drug Screen] was positive for opiates 200. At first Holly did not know why she would have had a positive drug screen. No prescriptions. Later she stated she was taking her other daughter's prescribed cough medicine. Asked if there was codiene [sic] in the cough medicine as this would account for positive screen. Holly did not know. Holly has 4 other biological children in her custody. Baby's [umbilical] cord was sent for tox screen.

R. 67-3, CHFS Intake Summary, Pg. ID 1542.

---

[1]A Kentucky reporting statute requires that "[a]ny person who knows or has reasonable cause to believe that a child is dependent, neglected, or abused shall immediately cause an oral written report to be made" to local law enforcement, state police, or the CHFS. Ky. Rev. Stat. § 620.030(1)–(2).

The report was received by Bethany Grimes, a centralized intake social worker with the CHFS, who is responsible for determining whether a report meets the CHFS's criteria for opening a case. Grimes understood from the report that Holly was the primary caregiver to five children, including newborn A.M.S. Pursuant to the CHFS's Standards of Practice ("SOPs"), Grimes decided to open a case to investigate abuse or neglect of Holly's children because she thought that the children might be at a "risk of harm." R. 67-3, Grimes Dep., Pg. ID 1556. According to the relevant SOP, a child is at a risk of harm if "the caretaker engages in a pattern of conduct that renders him or her incapable of caring for the immediate and ongoing needs of the child due to incapacity due to alcohol or other drugs."[2] *Id.*; *see also* R. 67-7, SOP 2.3, Pg. ID 1624, 1632. The case was assigned to Defendant Allison Campbell, the superviser of Defendants Elizabeth Kammer ("Kammer") and Kara ("Kara").[3]

Later that afternoon, Holly and David were informed that A.M.S. could no longer be discharged because hospital policy required staff to observe A.M.S. for seventy-two hours for symptoms of withdrawal. St. Elizabeth permitted Holly to continue breastfeeding A.M.S. during the seventy-two hour observation period.

## B. The Prevention Plan

On the evening of that same day (the day of A.M.S.'s birth), two CHFS social workers—Defendants Kammer and Kara—visited Holly in her hospital room. Defendants asked Holly for the names of her other children and where they went to school, and inquired about Holly's "drug abuse." Holly insisted that there was an error with the initial test because she did not use drugs, worked at a childcare center, was her son's basketball coach, and volunteered in a school cafeteria. Kammer asked Holly to submit to another drug test, and Holly agreed. Holly's urine

---

[2]The SOP criteria track Kentucky Revised Statute Section 600.020, which in relevant part defines an "abused or neglected child" as "a child whose health or welfare is harmed or threatened with harm when . . . his or her parent, guardian . . . or other person exercising custodial control or supervision of the child . . . [e]ngages in a pattern of conduct that renders the parent incapable of caring for the immediate and ongoing needs of the child, including but not limited to parental incapacity due to a substance use disorder as defined in KRS 222.005." Ky. Rev. Stat. § 600.020(1)(a)(3). Section 222.005 defines "substance use disorder" as "a cluster of cognitive, behavioral, and physiological symptoms indicating that the individual continues using the substance despite significant substance-related problems." *Id.* § 222.005(12).

[3]Kara's surname is unknown. Defendants' Notice of Appeal identifies her as Jane Doe "Kara X."

was tested for the second time at 7:55 p.m. that evening.  The results from the umbilical cord test performed earlier that day were still pending.

At that point, Kammer, who was still in training at the time, called her supervisor, Defendant Allison Campbell.  Campbell spoke with Holly and asked her, "[h]ow did the heroin get into your system?"  R. 34, Am. Compl., Pg. ID 514.  When Holly insisted that the test was a false positive, Campbell told her, "[w]ell, until this gets figured out you are no longer allowed to be around any children without the supervision of approved individuals."  *Id.*

After the conversation with Campbell, and while the toxicology results of the umbilical cord test and second urine test were still pending, Kammer presented Holly with a predominately handwritten, single-page document, titled "Prevention Plan."  According to Plaintiffs, Kammer explained to Holly that if Holly failed to follow the Prevention Plan's terms, all of the children in her house would be removed from Holly's care "and after that" the CHFS would seek a court order.  *Id.* at Pg. ID 514–15.  The Plan provided that Holly was required to have "supervised contact with all children by approved supervisors until notified by CHFS."  R. 67-9, Prevention Plan, Pg. ID 1659.  According to the Plan, "supervision" means that Holly could not be alone with her children and must remain within "eye & earshot" of approved supervisors "at all times (24/7)."  *Id.*

Kammer approved David Schulkers (Holly's husband) and Mary Schulkers (Holly's mother-in-law) as supervisors.  Kammer informed Holly and David that "if the supervisor steps out of the room, Holly has to follow and if the supervisor has to go to the bathroom Holly has to remove herself until the supervisor returns" and "said [that] if any restrictions were violated the children would 'be removed.'"  R. 34, Am. Compl., Pg. ID 515.  Stamped at the bottom of the document and in all capital letters, the Prevention Plan stated: "Absent effective preventative services, placement in foster care is the planned arrangement for this child."  R. 67-9, Prevention Plan, Pg. ID 1659.  However, the CHFS had not planned any arrangement for foster care for A.M.S.  Instead, that language is stamped on every prevention plan that the CHFS provides.

Under these conditions, the Schulkers signed the document less than 30 hours after giving birth and under the belief that if they did not agree to the Prevention Plan, all of the children in

their house would be removed from Holly's care "and after that" the CHFS would seek a court order.

At one point, while Kammer and Kara were still in the room, Holly's night nurse questioned the Prevention Plan and reported that A.M.S. was clearly healthy and that the nursing staff and doctors believed that Holly's first urine test was a false positive. The nurse also pointed out that, in the past, other women with open cases were allowed to leave the hospital with their newborns, and that she had seen several situations in which the CHFS would not get involved regarding "presumptive positive" results on expectant mothers until after the results were confirmed with umbilical cord testing. In response to these comments, Kara pulled the night nurse aside in the hallway and said, "[w]e are supposed to be working as a team, why are you pitting them against me?" R. 34, Am. Compl., Pg. ID 515–16.

After Defendants left, Holly's night nurse informed Holly and David that St. Elizabeth uses a lower threshold level for a positive drug test result than required by federal regulations.

## C. Subsequent Testing Reveals a False Positive

At 8:00 p.m., the same day that Holly gave birth and approximately two hours after the Schulkers signed the Prevention Plan, Holly's second urine test results came back as "negative" for any illegal substances. Holly's night nurse called Kammer and left a voicemail.

Between 5:00 a.m. and 6:00 a.m. the next day, Dr. James Otrembiak visited Holly's hospital room to check on A.M.S. He told Holly that he had received a phone call from a social worker the day before stating that Holly had tested positive for drugs, and that he had informed the social worker that he believed the test must have been a false positive. He also told Holly that eating poppy seed chips could cause a false positive. He later charted:

> AWAITING DISPOSITION FROM SOCIAL SERVICE. NO NOTE IN CHART . . . Mom's repeat drug screen negative. Baby's cord blood drug screen still pending. Mom states she took some cough med prior to delivery. And also had a bag of . . . chips with Poppy seeds while in labor. She showed me the bag! []poppy seeds, delsum, are among the Products that can cause a false positive for opiates on drug screen. Planning on discharge tomorrow. Need final disposition for discharge from social service.

R. 21-2, Hospital Record, Pg. ID 303.

At 1:32 p.m. that same day (the day after Holly gave birth to A.M.S.), St. Elizabeth received A.M.S.'s umbilical cord test results, which were also "negative" for any illegal substances. Within twenty minutes, St. Elizabeth e-mailed the negative test results from both Holly's second urine test and A.M.S.'s umbilical cord test to the CHFS. At 3:45 p.m., Kammer confirmed that she had received both of the negative test results.

Thus, Plaintiffs allege that as of 3:45 p.m. on Saturday, February 11, 2017—the day after Holly gave birth to A.M.S.—the CHFS, and specifically Kammer, had actual knowledge that:

> a. The medical professionals for Holly and Baby AMS professed Baby AMS was completely healthy and believed that the pre-delivery presumptive positive test result was a false positive, evidenced by the fact Holly was permitted to breast feed immediately after birth and continued through the discharge of Baby AMS.
>
> b. The result of Holly's second (and more specific) 'confirming' urine test was negative for drugs;
>
> c. The result of the umbilical cord test (by far the most accurate and determinative test given) was also negative for drugs.
>
> d. There was no Court Order nor any petition filed with any Court in order to justify further sanctioning or restricting the Plaintiffs.

R. 34, Am. Compl., Pg. ID 517.

Despite knowledge that both tests were negative for drugs, the CHFS approved the discharge of A.M.S. only "under supervision of the father" and "pursuant to the Prevention Plan" requiring supervision. *Id.* at Pg. ID 528. A St. Elizabeth employee received a copy of the Child Protective Services discharge plan, and charted that: "Per CPS plan, [A.M.S.] may discharge to [Holly] under supervision of an approved supervisor. At this time both Mary Schulkers and David Schulkers (spouse) are approved supervisors." R. 21-1, Hospital Record, Pg. ID 335–36. At approximately 11:00 a.m. on February 12, 2017, the Schulkers were permitted to take A.M.S. home under the terms of the Prevention Plan.

On Monday, February 13, 2017, David stayed home from work in order to supervise Holly around the children. At 9:00 that morning, Holly called Kammer to again request to be

released from the Plan. Kammer told Holly that she had to talk to Alison Campbell. Campbell refused to release the Schulkers from the Prevention Plan.

At that point, David and Holly decided to hire an attorney. Holly contacted an attorney who advised her to take a hair follicle drug test.

**D. The In-School Interviews**

Later that same day, Kammer and another CHFS social worker went to a public elementary school to interview three of the Schulkers' children, B.O.B. (age 8), B.R.B. (age 9), and E.M.S. (age 9), and then went to a public middle school to interview the Schulkers' fourth child, E.E.S. (age 13). Neither Kammer nor the other social worker obtained a warrant to conduct the interviews. Holly and David did not consent to the interviews, and they were unaware that the interviews were being conducted.

At Defendants' behest, the school staff removed each child from their respective classrooms. Beginning with B.R.B., each child was brought into a room with Kammer and the other social worker, and the door was then shut. School personnel were not permitted to stay with the children during the interviews. The interviews lasted approximately thirty minutes, during which time the children were questioned about "mommy using drugs," alcohol use, and whether there was arguing or physical violence in the house. According to Plaintiffs, the children did not believe that they were, nor were they, free to leave the room until they were released by the social workers. Plaintiffs allege that the children returned home that afternoon terrified and crying, stating that they were afraid of being "taken away" and wanted to know if their mother or father was going to jail. This was when Holly and David first learned of the interviews.

**E. The CHFS Continues to Require the Schulkers to Comply with the Prevention Plan**

On multiple occasions that week, Holly's counsel requested that Campbell or Kammer issue a finding of "unsubstantiated," and close the case against the Schulkers, given the evidence that the initial urine test was a false positive. Each request was denied without explanation.

On Thursday, February 16, 2017, at her counsel's request, Holly took a hair follicle drug test in order to further negate any allegation of long-term drug use. The results of the hair follicle test were "negative" for any drug use, and Holly e-mailed those results to Campbell and Kammer on February 21, 2017.

Also on February 21, 2017, Holly's counsel e-mailed Campbell, Kammer, and other CHFS staff to notify them that Holly and David would no longer follow the restrictions of the Prevention Plan and that any further action must proceed through a court. Pursuant to the Plan, Holly and Holly's counsel were under the impression that until the Plan was formally lifted, Holly was at risk that the CHFS could remove all of Holly's children from her care.

After receiving Holly's counsel's e-mail, Campbell decided to contact her supervisor, Jessica Brown, for guidance regarding Holly's requests to lift the Prevention Plan. In a phone conversation, Brown told Campbell to lift the Prevention Plan. Later that same day, Brown sent an e-mail to Campbell with instructions to respond to Holly's attorney and to inform her that they "agree that a negative hair follicle test in conjunction with the other information obtained . . . warrant[s] lifting the supervision plan at this time. We will be reaching out to the family to update our prevention plan to reflect this change." R. 67-5, Brown Dep., Pg. ID 1576. However, Campbell did not send that e-mail to Holly's counsel and did not inform the Schulkers that they were no longer under the restrictions of the Prevention Plan.

Over the next six weeks, Holly's counsel and Holly made repeated requests to be released from the Prevention Plan, but the CHFS would not lift the Plan. The Plan remained in effect and the CHFS continued its investigation. At some point during the week of March 17, 2017, Kammer contacted David's ex-wife, the biological mother of E.E.S. and E.M.S., as part of the investigation. On March 29, 2017, the CHFS again expressly refused to close the investigation. According to Plaintiffs, Holly and David "lived in fear the [CHFS] would take their children (as [it] promised to do) for their failure to follow the Prevention Plan" during that time. R. 34, Am. Compl., Pg. ID 521.

Finally, on April 7, 2017—approximately two months after Holly gave birth to A.M.S.—the case was labeled "unsubstantiated."  On April 10, 2017, the CHFS notified Holly by letter that the case had been "unsubstantiated," meaning that the Prevention Plan was terminated.

## PROCEDURAL HISTORY

Plaintiffs initiated this 42 U.S.C. § 1983 lawsuit in May 2017.  Plaintiffs filed a Second Amended Complaint in October 2017, which is the operative complaint in this case.  Plaintiffs allege that Defendants Campbell and Kammer violated B.O.B., B.R.B., E.E.S., and E.M.S.'s rights to be free from unreasonable seizures under the Fourth Amendment by subjecting them to the in-school interviews conducted on February 13, 2017.  Plaintiffs further allege that Defendants Campbell, Kammer, and Kara violated their Fourteenth Amendment rights to substantive and procedural due process by imposing the Prevention Plan's supervision restrictions on their family without any procedural protections, even after there was no reasonable suspicion of abuse or neglect.  Plaintiffs allege that Defendants' actions were taken in bad faith and for the purpose of obtaining federal reimbursement funds pursuant to Title IV-E, 42 U.S.C. § 672 *et seq.*[4]

After limited discovery, Defendants moved to dismiss Plaintiffs' complaint or in the alternative moved for summary judgment, arguing *inter alia* that Defendants are entitled to qualified immunity.  The district court denied summary judgment on February 8, 2019, rejecting Defendants' qualified-immunity defense to Plaintiffs' Fourth and Fourteenth Amendment claims.  The district court found that the children had a clearly established Fourth Amendment right to be free from unreasonable seizures, which was violated when Defendants conducted the warrantless, in-school interviews.  Further, the district court found that Plaintiffs had a clearly established substantive due process right to family integrity and that Plaintiffs produced sufficient evidence to create a genuine dispute as to whether Defendants violated that right.  Lastly, the district court found that Plaintiffs had a clearly established right to procedural due

---

[4]According to Plaintiffs, Title IV-E allows states to receive reimbursement for costs related to a child abuse investigation on behalf of a child who is receiving services within their home so long as there is a defined "prevention plan" in place under which foster care is the planned arrangement for the child. *See* R. 34, Am. Compl., Pg. ID 522.  Plaintiffs allege that "the Title IV-E funds motivated the initiation, continuing investigation, and Campbell, Kammer, and the Cabinet's refusal to terminate the investigation." *Id.*

process before Defendants could constrain Holly's contact with her children without a finding that she was unfit as a parent, which was violated in this case.

Defendants now appeal the district court's denial of qualified immunity.

**DISCUSSION**

**I. Standard of Review**

This Court reviews a district court's denial of a defendant's motion for summary judgment on qualified immunity grounds *de novo*. *Rafferty v. Trumbull County*, 915 F.3d 1087, 1093 (6th Cir. 2019). "A defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 724 F.3d 687, 695 (6th Cir. 2013) (quoting *Morrison v. Bd. of Trs.*, 583 F.3d 394, 400 (6th Cir. 2009)); *accord Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). This Court has discretion to choose which prong of the qualified immunity inquiry to consider first. *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If the court finds that the plaintiff's right was not clearly established at the time of the defendant's conduct, the court does not need to determine whether the alleged conduct was in fact unconstitutional. *See id.* at 236–43.

A right is clearly established for purposes of overcoming the qualified immunity defense when existing precedent has "placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). The purpose of qualified immunity is to "give[] government officials breathing room to make reasonable but mistaken judgments" by "protect[ing] all but the plainly incompetent or those who knowingly violate the law." *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration in original) (quoting *al-Kidd*, 563 U.S. at 743). "As the Supreme Court has explained, '[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Rafferty*, 915 F.3d at 1093 (alteration in original) (quoting *Pearson*, 555 U.S. at 231). Thus, the

Supreme Court has recently reiterated that an official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014)). "Notice to officials is paramount; 'the salient question' in evaluating the clearly established prong is whether officials had 'fair warning' that their conduct was unconstitutional." *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

The plaintiff bears the burden of showing that an officer is not entitled to qualified immunity. *Rafferty*, 915 F.3d at 1093. When determining whether defendants are entitled to qualified immunity, "we do not lump together each of the relevant government actors. Rather, we assess each actor's liability on an individual basis." *Jones v. City of Elyria*, 947 F.3d 905, 913 (6th Cir. 2020).

## II. Plaintiffs' Fourth Amendment Claims

"The Fourth Amendment protects against unreasonable searches and seizures." *Andrews v. Hickman County*, 700 F.3d 845, 854 (6th Cir. 2012). This Court has held that the Fourth Amendment's warrant requirement governs social workers just like any other government official. *See, e.g.*, *id.* at 859 ("[A] social worker, like other state officers, is governed by the Fourth Amendment's warrant requirement."); *accord Kovacic*, 724 F.3d at 695. And children are entitled to the Fourth Amendment's protections even when they are away from home and attending public school. *See, e.g.*, *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370–71 (2009); *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985).

Pursuant to these principles, Plaintiffs B.O.B., B.R.B., E.M.S., and E.E.S., through their Next Friend, argue that Kammer (acting at the behest of Campbell) violated their Fourth Amendment rights by seizing them from their public-school classrooms and interviewing them without reasonable suspicion, a warrant, or consent. In response, Defendants argue that they are entitled to qualified immunity because it was not clearly established that social workers are bound by the Fourth Amendment when conducting in-school interviews pursuant to a child

abuse investigation.  They point out that neither the Supreme Court nor this Court has ever held that analogous conduct by a social worker violates the Fourth Amendment.

For the reasons that follow, we find that Plaintiffs did not have a clearly established Fourth Amendment right to be free from warrantless, in-school interviews by social workers investigating child abuse at the relevant time.  This is because our precedent is unclear about the role of the Fourth Amendment in the specific factual circumstances alleged here, *i.e.*, when social workers perform an in-school interview of a child pursuant to an abuse investigation.  However, we also exercise our discretion to consider the second prong of the qualified immunity inquiry and conclude that Defendants' alleged conduct in this case was unconstitutional.  *See Pearson*, 555 U.S. at 236.  We hold that, at a minimum, social workers investigating child abuse must have "some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse" before seizing a child from his or her school classroom without a warrant and when no other exception to the warrant requirement applies.  *Doe v. Heck*, 327 F.3d 492, 515 (7th Cir. 2003) (quoting *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir. 2000)).

## A.  Clearly Established Right

We first consider whether Plaintiffs' right was clearly established at the time of Defendants' conduct.  In answering that question, "we look first to decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal."  *Andrews*, 700 F.3d at 853.

The Supreme Court has never held that a social worker's warrantless in-school interview of a child pursuant to a child abuse investigation violates the Fourth Amendment.  In 2011, the Supreme Court granted certiorari on this issue but its opinion did not reach the merits of the issue due to mootness.  *See Camreta v. Greene*, 563 U.S. 692, 713–14 (2011).  In *Camreta*, a panel of the Ninth Circuit had found that a child protection agency's decision to seize and interrogate a child at school without a warrant violated the Fourth Amendment.  *Greene v. Camreta*, 588 F.3d 1011, 1030 (9th Cir. 2009), *vacated in part*, 563 U.S. 692 (2011), *and vacated in part*, 661 F.3d 1201 (9th Cir. 2011).  However, the Ninth Circuit granted the defendant social worker qualified

immunity because it found that its "precedent did not clearly establish that the in-school seizure of a student suspected of being the victim of child sexual abuse can be subject to traditional Fourth Amendment protections." *Id.* at 1033. Putting to rest a common defense in school-interview cases—one that Defendants assert here—the Ninth Circuit "hasten[ed] to note that government officials investigating allegations of child abuse should cease operating on the assumption that a 'special need' automatically justifies dispensing with traditional Fourth Amendment protections in this context." *Id.* Instead, the Ninth Circuit held that "traditional Fourth Amendment requirements" apply to social workers' in-school interviews of children. *Id.* at 1026.

In its decision vacating that portion of the Ninth Circuit's opinion, the Supreme Court found that "the happenstance of [the student's] moving across country and becoming an adult . . . has frustrated [the defendant's] ability to challenge the Court of Appeals' ruling that he must obtain a warrant before interviewing a suspected child abuse victim at school." *Camreta*, 563 U.S. at 713–14. On remand, the Ninth Circuit vacated the section of its prior opinion addressing the Fourth Amendment issue. *Greene*, 661 F.3d at 1201.

Following the vacatur for mootness in *Camreta*, the Supreme Court has not since addressed whether the Fourth Amendment governs a social worker's warrantless in-school interview of a child pursuant to an abuse investigation. This Court has considered the issue in only one prior case.

In *Barber v. Miller*, 809 F.3d 840 (6th Cir. 2015), we held that a child's right to avoid warrantless, in-school interviews by social workers on suspicion of child abuse was not clearly established in 2011. *Id.* at 845. In that case, one of Barber's family members reported to the state child protective services agency that Barber was neglecting his son. *Id.* at 842. In response to the report, a state social worker interviewed Barber's son at school without a warrant or consent. *Id.* The social worker also interviewed Barber at his home. *Id.* at 843. Approximately one week later, the social worker again interviewed Barber's son at school without a warrant or consent. *Id.* Based on the in-school interviews, the social worker petitioned for a court order to place Barber's son in protective custody. *Id.* The court issued the order but returned custody to Barber two days later following a hearing. *Id.* Barber then sued the social worker on behalf of

his son, arguing that the warrantless in-school interviews violated his son's Fourth Amendment rights. *Id.*

This Court upheld the district court's grant of qualified immunity to the social worker because we found that the child did not have a clearly established Fourth Amendment right "to avoid warrantless, in-school interviews by social workers on suspicion of child abuse" as of 2011. *Id.* at 845. Because we granted qualified immunity to the social worker on the ground that the law was not clearly established, we did not reach the question of whether the social worker's warrantless in-school interviews of the child were in fact unconstitutional. *See id.* at 845–47.

However, we did consider Barber's argument that the warrantless, in-school interviews contravened the holdings of two of our cases decided after 2011: *Kovacic v. Cuyahoga County Department of Children & Family Services*, 724 F.3d 687 (6th Cir. 2013), and *Andrews v. Hickman County*, 700 F.3d 845 (6th Cir. 2012). Distinguishing those cases on the basis that they involved seizures of a child within the home, we held that neither *Kovacic* nor *Andrews* governs a social worker's warrantless interview of a child that takes place in the school. *See Barber*, 809 F.3d at 845–47. We stated that "[i]nasmuch as both decisions turned on the greater constitutional concerns surrounding government intrusion into a citizen's home . . . they offer [the plaintiff] little support in arguing that the *in-school* interviews violated [his] clearly established Fourth Amendment rights." *Id.* at 846 (citing *Kovacic*, 724 F.3d at 698–99; *Andrews*, 700 F.3d at 856, 859). Thus, we found that the plaintiff-child fell short "of demonstrating that [his] Fourth Amendment rights in the context of warrantless, in-school interviews by social workers on suspicion of child abuse were clearly established in our circuit at the time of the interviews." *Id.* at 847.

Following *Barber*, this Court has not had another occasion to consider the constitutionality of in-school interviews like the one at issue here. Therefore, we can find no reason to depart from *Barber*'s holding that the law surrounding in-school interviews by social workers is not clearly established in this circuit. Plaintiffs' argument that *Andrews* and *Kovacic* supply the requisite clearly established law to overcome Defendants' qualified immunity defense is unavailing because this Court in *Barber* held that those cases do not govern a social worker's conduct in the school setting. *See id.* at 846–47. By distinguishing *Andrews* and *Kovacic* on

their facts, *Barber* suggested that the Fourth Amendment could proscribe different conduct in the home versus the school setting for purposes of child abuse investigations.  Moreover, *Barber* did not define what conduct, if any, the Fourth Amendment proscribes in the school setting because it declined to reach the merits of the underlying constitutional claim.  Therefore, we find that a reasonable social worker in Defendants' position would not have known that Plaintiffs had a Fourth Amendment right to be free from the in-school interviews that occurred.  *Cf. United States v. Lanier*, 520 U.S. 259, 271 (1997) (explaining that "[i]n some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary" in order to show that a right was clearly established).  Defendants Kammer and Campbell are entitled to qualified immunity on this claim.

### B.  Constitutional Violation

Because we find that the district court should have granted summary judgment in favor of Defendants Kammer and Campbell on Plaintiffs' Fourth Amendment claim, we do not need to decide whether their conduct was in fact unconstitutional.  *See, e.g.*, *Pearson*, 555 U.S. at 236.  However, after carefully considering the Supreme Court's guidance on when a court of appeals should exercise its discretion to reach the underlying constitutional question in a qualified immunity case, we decide to reach that question now in order to "promote[] the development of constitutional precedent," *id.*, and "promote[] clarity in the legal standards for official conduct, to the benefit of both the officers and the general public," *Wilson v. Layne*, 526 U.S. 603, 609 (1999).  *See also, e.g.*, *Plumhoff*, 572 U.S. at 774 (exercising the Court's discretion to resolve the underlying constitutional claim in order to develop constitutional precedent in an area in which the qualified immunity defense is typically available to defendants).  For the reasons that follow, we hold that under Plaintiffs' version of the facts, Kammer and Campbell violated the plaintiff children's Fourth Amendment rights by seizing them from their classrooms without a warrant and without any reasonable suspicion of child abuse or neglect.

The threshold question to determine if Plaintiffs' Fourth Amendment rights were violated is whether Plaintiffs were "seized" within the meaning of the Fourth Amendment.  "A seizure occurs when, 'in view of all the circumstances surrounding the incident, a reasonable person

would have believed he was not free to leave.'" *O'Malley v. City of Flint*, 652 F.3d 662, 668 (6th Cir. 2011) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554 (1980)). Courts generally should take into account the plaintiff's age when determining if a reasonable person would have felt free to leave. *E.g.*, *Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005); *Heck*, 327 F.3d at 510. In the present case, Defendants do not argue that Plaintiffs were not seized within the meaning of the Fourth Amendment, and for good reason.

Plaintiffs allege that per Campbell's instructions, Kammer and another CHFS social worker went to a public elementary school to interview three of the Schulkers' children, B.O.B. (age 8), B.R.B. (age 9), and E.M.S. (age 9), and then went to a public middle school to interview the Schulkers' fourth child, E.E.S. (age 13). The social workers did not obtain a warrant or parental consent to conduct the interviews. At the social workers' behest, the school staff removed each child from his or her classrooms, and each child was brought into a room with Kammer and the other social worker where the door was then shut. School personnel were not permitted to stay with the children during the interview and each interview lasted approximately thirty minutes, during which time the children were questioned about "mommy using drugs," alcohol use, and whether there was arguing or physical violence in the house. These facts, which Defendants have not rebutted, clearly demonstrate a genuine factual dispute as to whether a reasonable child in Plaintiffs' position would have felt free to leave the interview. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (when evaluating a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party).

Having determined that Plaintiffs were seized within the meaning of the Fourth Amendment, the next question is whether the seizures were reasonable. In general, a search or seizure must be supported by probable cause in order to comply with the Fourth Amendment. *E.g.*, *T.L.O.*, 469 U.S. at 340. However, there are several exceptions to the probable cause requirement, including consent, exigent circumstances, and in some instances, "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (quoting *T.L.O.*, 469 U.S. at 351 (Blackmun, J., concurring in judgment)). Thus, in *New Jersey v. T.L.O.*, the

Supreme Court held that "the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law."  469 U.S. at 341.  Instead, the Court held that "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search."  *Id.*  Where the special needs doctrine applies, a court must determine the reasonableness of the search or seizure pursuant to the modified reasonableness inquiry of *Terry v. Ohio*, 392 U.S. 1, 20 (1968).  *See T.L.O.*, 469 U.S. at 341.  Under this inquiry, a court should first determine "whether the . . . action was justified at its inception," and second, the court should determine whether the search or seizure "was reasonably related in scope to the circumstances which justified the interference in the first place."  *Id.* at 341–42 (alteration in original) (quoting *Terry*, 392 U.S. at 20).

There is some disagreement in the circuits regarding whether the special needs exception applies to a social worker's in-school interview of a child pursuant to a child abuse investigation, and this Court has not yet spoken to the issue.  As discussed above, in a decision that has since been vacated, the Ninth Circuit held that the Fourth Amendment's traditional probable cause standard applies to a social worker's seizure of a child from school pursuant to a child abuse investigation.  *See Greene*, 588 F.3d at 1030.  Other circuits have indicated that the lesser, modified reasonableness standard of *New Jersey v. T.L.O.* may govern a social worker's seizure of a child from a public school pursuant to an abuse investigation.  *See Heck*, 327 F.3d at 513–14 (applying the probable cause standard to evaluate the reasonableness of a social worker's seizure of a child from a private school, but noting that a modified reasonableness standard may apply to seizures on public school grounds).  In *Jones v. Hunt*, the Tenth Circuit considered which standard might govern a social worker's interview of a child at a public school pursuant to an abuse investigation, but the court found that it was ultimately unnecessary to determine whether a special needs exception applied because the social worker's conduct in that case failed even under *T.L.O.*'s modified reasonableness standard.  *See Jones*, 410 F.3d at 1228 ("It is ultimately unnecessary for us to decide what Fourth Amendment test is most appropriate in this case 'because the conduct alleged in [this] case would violate the most minimal standard of which we can conceive.'" (alteration in original) (quoting *Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir.

1990))). The same is true here. In the present case, we do not need to decide which Fourth Amendment standard governs a social worker's in-school interview of a child pursuant to an abuse investigation because Defendants' alleged conduct fails even the modified reasonableness standard of *New Jersey v. T.L.O.*

Applying that standard to this case, we find that Defendants' conduct violated Plaintiffs' Fourth Amendment rights. Plaintiffs allege that before the CHFS Defendants conducted the interviews, Defendants knew (1) that St. Elizabeth staff believed the pre-delivery test of Holly's urine was a false positive and were permitting Holly to continue to breastfeed A.M.S., (2) that Holly's second confirmatory urine test results were negative, and (3) that the results of the umbilical cord testing were also negative. Therefore, Plaintiffs allege that Defendants did not have *any* plausible suspicion that the Schulkers' children were subjected to abuse or neglect at the time they conducted the interviews. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that Defendants' seizure of Plaintiffs was not "justified at its inception." *T.L.O.*, 469 U.S. at 341 (quoting *Terry*, 392 U.S. at 20). Moreover, based on these facts, Plaintiffs have demonstrated that the state did not have any significant interest in interviewing the children that "was reasonably related in scope" to the seizures at issue. *See id.* In fact, Plaintiffs have alleged that prior to the interviews, Defendants did not have any legitimate reason to suspect Holly of child abuse or neglect. Thus, under these facts, we find that Defendants violated Plaintiffs' Fourth Amendment rights by seizing them from their classrooms and subjecting them to interrogation without any suspicion of child abuse, and without obtaining a warrant or consent. We hold that the Fourth Amendment governs a social worker's in-school interview of a child pursuant to a child abuse investigation, and thereby clarify our decision in *Barber v. Miller*, 809 F.3d at 847. At a minimum, a social worker must have reasonable suspicion of child abuse before conducting an in-school interview without a warrant or consent. Therefore, Defendants' conduct in this case, as alleged by Plaintiffs, was unconstitutional because it failed to satisfy even the lesser modified reasonableness standard of *New Jersey v. T.L.O.* The seizures were not "justified at [their] inception" and they were not "reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 569 U.S. at 341 (quoting *Terry*, 392 U.S. at 20).

## III. Plaintiffs' Fourteenth Amendment Claims

Having determined that Defendants are immune from suit on Plaintiffs' Fourth Amendment claims, we next consider whether Defendants Campbell, Kammer, and Kara are entitled to qualified immunity from suit on Plaintiffs' Fourteenth Amendment claims. For the reasons that follow, we find that they are not.

### A. Clearly Established Rights

We turn first to whether Plaintiffs' rights were clearly established at the time of Defendants' conduct. Plaintiffs contend that Defendants violated their rights to both procedural and substantive due process under the Fourteenth Amendment by constraining Holly's ability to be alone with her children for approximately two months without any valid governmental interest and without affording the Schulkers any procedural protections, such as notice or a hearing. The Due Process Clause of the Fourteenth Amendment says that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. This clause ensures fair process and safeguards "a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). As the district court correctly stated, "[t]he touchstone of due process is the protection against arbitrary governmental action, including 'the exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" *Schulkers v. Kammer*, 367 F. Supp. 3d 626, 637 (E.D. Ky. 2019) (quoting *Lewis*, 523 U.S. at 845–46).

This Court has held that "[i]t is clearly established that the Constitution recognizes both a protectible procedural due process interest in parenting a child and a substantive fundamental right to raise one's child." *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000) (collecting cases); *accord Smith v. Williams-Ash*, 520 F.3d 596, 599 (6th Cir. 2008) ("[U]nder the [Fourteenth Amendment], the parent-child relation gives rise to a liberty interest that a parent may not be deprived of absent due process of law." (alterations in original) (quoting *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006))). In *Bartell*, we explained that "the differences

between the procedural interest in raising one's child and the substantive right, and the corresponding scope of the duties imposed on government, are significant. While procedural due process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests . . . substantive due process provides that, irrespective of the constitutional sufficiency of the processes afforded, government may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose." 215 F.3d at 557–58 (citing *Mathews v. Eldridge*, 424 U.S. 319, 333–34 (1976); *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

Plaintiffs argue that Defendants unconstitutionally exceeded their powers in both ways in the present case. First, they argue that Defendants violated their substantive right to family integrity because the supervision restrictions were not necessary and were not supported by any compelling governmental interest, given that Defendants had no reason to suspect Holly of child abuse. Next, Plaintiffs argue that they were not afforded any process before suffering this liberty deprivation, and thus Defendants violated their right to procedural due process.

### i. Substantive Due Process

To start, we consider Plaintiffs' substantive due process claim. The Supreme Court has repeatedly held that "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)). Thus, in *Lassiter v. Department of Social Services*, the Supreme Court declared that it is "plain beyond the need for multiple citation" that a parent's "desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" 452 U.S. 18, 27 (1981) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). And, in *Cleveland Board of Education v. LaFleur*, the Court stated that "freedom of personal choice in matters of . . . family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." 414 U.S. 632, 639 (1974); *see also Quilloin*, 434 U.S. at 255 (stating that *LaFleur* "firmly established" the right to personal choice in matters of family life); *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion)

(recognizing "the fundamental right of parents to make decisions concerning the care, custody, and control of their children").

Indeed, in many ways the right at issue in this case—the right to family integrity and association without interference from the state—is the paradigmatic example of a substantive due process guarantee. *See, e.g.*, *Moore v. City of E. Cleveland*, 431 U.S. 494, 498–99 (1977) ("A host of cases . . . have consistently acknowledged a 'private realm of family life which the state cannot enter.'" (quoting *Prince*, 321 U.S. at 166)); *see also Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children.  This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.").  Therefore, the district court correctly found  that Plaintiffs' right "to make decisions concerning the care, custody, and control of [their] children" without arbitrary government interference was clearly established at the time of Defendants' conduct.  *Troxel*, 530 U.S. at 66.  Defendants' arguments to the contrary are unavailing.

First, Defendants argue that the Schulkers' interest in family integrity was outweighed by the state's interest in preventing child abuse.  *Cf. Bartell*, 215 F.3d at 558 ("Although [the plaintiff] has a fundamental right to raise her son, the State has a concomitant interest in the welfare and health of children in its jurisdiction, and in certain narrowly-defined circumstances, the State's interest in a child's well-being may supersede that of a parent.").  However, as alleged by Plaintiffs, the state did not have any interest in preventing child abuse in the present case because they had no reason to suspect Holly of child abuse at the time that the supervision restrictions were imposed.  Therefore, the district court correctly found that the supervision restrictions contravened "the traditional presumption" articulated by the Supreme Court in *Troxel* "that a fit parent will act in the best interest of his or her child."  *Troxel*, 530 U.S. at 69; *see also id.* at 68–69 ("[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.").  When, as Plaintiffs allege here, the government prevents a fit mother from being alone with her children "at all times (24/7)" without any compelling government interest,

it clearly contravenes this presumption. R. 67-9, Prevention Plan, Pg. ID 1659. Moreover, on interlocutory appeal from a denial of qualified immunity, the defendants must be willing to concede the plaintiff's version of the facts for purposes of the appeal. *See Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir. 2002).

Under the above cases, we find that Defendants had fair notice that the Schulkers had a protected liberty interest in "the companionship, care, custody and management of [their] children," *Lassiter*, 452 U.S. at 27, and in the right "to make decisions concerning the care, custody, and control of [their] children" without arbitrary government interference, *Troxel*, 530 U.S. at 66. And we find that these cases placed Defendants on fair notice that depriving Plaintiffs of this liberty interest without a compelling governmental interest would be unlawful. *See, e.g.*, *Bartell*, 215 F.3d at 558 (balancing the parental interest in the companionship and management of his or her children against the weight of the government's countervailing interest); *accord, e.g.*, *Lassiter*, 452 U.S. at 27.

Defendants next argue that Holly did not have a clearly established right to be alone with her own children in her home because most of the cases in this circuit dealing with the right to family integrity address that right in the context of the child's physical removal from a parent's care or termination of parental rights. *E.g.*, *Kottmyer*, 436 F.3d at 691 ("A parent is necessarily deprived of his or her right to custody and control of their child, either permanently or temporarily, when a child is removed from the home."). However, Defendants' argument places too high a burden on Plaintiffs at this stage of the proceedings. What matters for determining if a right is clearly established for purposes of overcoming the qualified immunity defense is whether the contours of the allegedly violated right were "sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640; *see also, e.g.*, *Guertin*, 912 F.3d at 932 ("Notice to officials is paramount; 'the salient question' in evaluating the clearly established prong is whether officials had 'fair warning' that their conduct was unconstitutional." (quoting *Hope*, 536 U.S. at 741)); *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) ("While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate." (quoting *D.C. v. Wesby*, 138 S. Ct. 577, 581 (2018))).

As discussed above, Plaintiffs have a well-established right "to the companionship, care, custody and management of [their] children," *Lassiter*, 452 U.S. at 27, and this Circuit has consistently held that "the Constitution recognizes . . . a substantive fundamental right to raise one's child," *Bartell*, 215 F.3d at 557. *See also Kottmyer*, 436 F.3d at 689 ("There is no doubt that under the constitution, the parent-child relation gives rise to a liberty interest that a parent may not be deprived of absent due process of law.").

In the present case, while the supervision restrictions did not deprive Holly of the physical companionship of her children, they nevertheless constituted an interference with the natural "parent-child relation." *Kottmyer*, 436 F.3d at 689. By arbitrarily mandating when Holly could be with her children and who would have to be present in order for her to remain with them, the Prevention Plan abridged the Schulkers' due process right to family integrity under *Troxel*. Numerous Supreme Court cases have found that a parent has a fundamental right to "the companionship, care, custody and management of his or her children," *Lassiter*, 452 U.S. at 27, and that "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children," *Troxel*, 530 U.S. at 68–69. Therefore, the district court correctly found that Defendants were on fair notice that it would be unlawful to deprive Holly of her liberty interest in the companionship of her children without any plausible suspicion of child abuse. As the Supreme Court stated in *Moore*, "unless we close our eyes to the basic reasons why certain rights associated with the family have been accorded shelter under the Fourteenth Amendment's Due Process Clause, we cannot avoid applying the force and rationale of these precedents to the family choice involved in this case." 431 U.S. at 501.

### ii. Procedural Due Process

After finding that the Schulkers have a clearly established liberty interest in the companionship and management of their children, we next consider whether that substantive right triggered protections of the procedural due process clause. Again, this Court and others have consistently held that it does. *See, e.g.*, *Bartell*, 215 F.3d at 557 ("It is clearly established that the Constitution recognizes both a protectible procedural due process interest in parenting a

child and a substantive fundamental right to raise one's child."); *Smith*, 520 F.3d at 599 ("[U]nder the [Fourteenth Amendment], the parent-child relation gives rise to a liberty interest that a parent may not be deprived of absent due process of law." (quoting *Kottmyer*, 436 F.3d at 689)); *accord Croft v. Westmoreland Cty. Children & Youth Servs.*, 103 F.3d 1123, 1125–26 (3d Cir. 1997).

In *Smith v. Williams-Ash*, this Court recognized a limited exception to the traditional due process safeguards in the child-removal context. We held that a hearing is not required when parents voluntarily consent to the terms of a prevention plan similar to the one at issue here. *Smith*, 520 F.3d at 599–601. In that case, a social worker removed the plaintiffs' children from their home pursuant to a safety plan, which the parents voluntarily entered and which authorized the removal. *Id.* at 598. Adopting the reasoning of another circuit, this Court held that "when a parent voluntarily consents to a safety plan [in a child-abuse investigation], 'no hearing of any kind is necessary; hearings are required for deprivations taken over objection, not for steps authorized by consent.'" *Id.* at 600 (quoting *Dupuy v. Samuels*, 465 F.3d 757, 761–62 (7th Cir. 2006)). Adopting the reasoning of *Dupuy*, this Court found that safety plans are not necessarily inherently coercive "when agencies force parents to sign the plan or face the threat of formal removal proceedings." *Id.* (citing *Dupuy*, 465 F.3d at 762). However, we noted that the *Smith* plaintiffs did not even argue that their consent to enter the plan was involuntarily given. *Id.* Instead, the *Smith* plaintiffs argued that they were not allowed to recover their children after the plan had been implemented. *Id.* Moreover, the document in *Smith* expressly stated that "your decision to sign this safety plan is voluntary" and provided a "clear, simple mechanism for rescinding the plan," which the *Smith* plaintiffs had failed to utilize. *Id.* at 598, 600. Accordingly, we found that the *Smith* plaintiffs "remained in the safety plan voluntarily at all times," and therefore rejected the plaintiffs' procedural due process claim. *Id.* at 600.

In contrast, in the present case, Plaintiffs allege that their decision to enter into the Prevention Plan was not voluntarily given. They contend that their "consent" was premised on the misrepresentation made initially by Campbell and then by Kammer that if they did not agree to the Plan, Defendants would immediately remove their children from their care and only "after that" seek judicial intervention. And the Plan document itself provided that, absent the

prevention measures, the Schulkers' children would be placed in foster care. Unlike in *Smith*, there was no statement of voluntariness and there was no information about the process for rescinding the plan on the face of the document. Moreover, the CHFS had not planned any arrangement for foster care for the Schulkers' children, so it appears that Defendants' threat that foster care was the "planned arrangement" for the children absent the Schulkers' consent to the Prevention Plan was false. Thus, the district court correctly found that Plaintiffs demonstrated a triable issue of fact about whether Plaintiffs knowingly and voluntarily entered into the Prevention Plan.

Therefore, to the extent that Defendants argue that they were not required to afford the Schulkers adequate procedural protections before interfering with their right to family integrity because of the Prevention Plan, we find such an argument unavailing. *Smith* reiterates the well-established rule that a state must afford a parent fair process before interfering with a parent's fundamental right to family integrity and the companionship of his or her children. *See id.* at 599; *accord Bartell*, 215 F.3d at 557. The only exception to this rule is when a parent *voluntarily* consents to the terms of a safety plan without duress. *See Smith*, 520 F.3d at 600 (adopting the reasoning of *Dupuy*, 465 F.3d at 761–62); *see also Dupuy*, 465 F.3d at 762–63 (upholding a safety plan based on consent where there was "no suggestion that the agency offer[red] a safety plan when it ha[d] no suspicion at all of neglect or abuse" and no allegations that would support a finding of "duress"). We analyze whether Plaintiffs have demonstrated a triable issue as to voluntariness at the second step of the qualified immunity inquiry. For now, we find only that these cases placed Defendants on "fair warning" that it would be unconstitutional to interfere with Plaintiffs' right to the companionship of their children without any procedural protections and without valid consent. *Guertin*, 912 F.3d at 932 (quoting *Hope*, 536 U.S. at 741)).

## B. Constitutional Violation

Because Defendants had fair notice that the alleged conduct was unconstitutional under the Fourteenth Amendment, we must determine whether Plaintiffs have demonstrated a genuine dispute of material fact as to each Defendant's individual liability. *See, e.g.*, *Jones*, 947 F.3d at 913. For the reasons that follow, we find that Plaintiffs have demonstrated a triable issue as to

whether each Defendant's conduct in fact violated their substantive and procedural due process rights.

### i. Substantive Due Process

Plaintiffs allege that as of 3:45 p.m. on Saturday, February 11, 2017—the day after Holly gave birth to A.M.S.—the CHFS Defendants, and particularly Kammer, knew four things. First, Defendants knew that St. Elizabeth staff believed that the pre-delivery urine drug test result was a false positive, and Defendants knew that the hospital was permitting Holly to continue to breastfeed A.M.S. Second, Defendants knew that the toxicology results of Holly's second and more reliable confirmatory urine test were negative for any illegal substances. Third, Defendants knew that the results of the umbilical cord testing, which was by far the most reliable of the tests given, were also negative. And fourth, Defendants knew that they had not filed any petition with the appropriate court in order justify the supervision restrictions. Plaintiffs allege that, nevertheless, Defendants continued to impose supervision restrictions on Holly for approximately two months until the Prevention Plan was lifted on April 7, 2017.

In response, Defendants point this Court to many factual disputes surrounding Plaintiffs' claim. For example, Defendants argue that they did not lift the Prevention Plan because Holly's attorney went out of the country and did not respond to e-mails, and that Holly did not actually abide by the supervision restrictions for most of the time that the Prevention Plan was in place. However, as Defendants acknowledge in their brief, when reviewing a district court's denial of a defendant's motion for summary judgment, we must view all evidence and draw all inferences in favor of the non-moving party. *See, e.g.*, *Andrews*, 700 F.3d at 852 (citing *Matsushita*, 475 U.S. at 587). Moreover, on interlocutory appeal based on a denial of qualified immunity, the defendants "must be willing to concede the facts as alleged by the plaintiff and discuss only the legal issues raised by the case." *Sheets*, 287 F.3d at 585. In this case, Plaintiffs make out a plausible substantive due process claim by putting forth evidence that Defendants deprived Holly of her right to be alone with her children in the sanctity of her home without arbitrary government interference (and, in turn, violated the children's right to be alone with their parent).

In other words, the state injected itself into the private realm of family life without any process or any doubt as to Holly's fitness as a parent, in violation of *Troxel*, 530 U.S. at 66.**⁵**

We also find that Plaintiffs have demonstrated a triable issue as to the individual liability of each Defendant. First, Plaintiffs allege that Alison Campbell was supervising Kammer and Kara at the time that the Prevention Plan was imposed and that Campbell failed to release the Schulkers from the Plan's restrictions even after being instructed to do so by her own supervisor, Jessica Brown. Moreover, Plaintiffs allege that it was initially Campbell who told Holly that she was not permitted to be alone with any of her children even before Holly signed the Prevention Plan document. Therefore, Plaintiffs have demonstrated a triable issue as to Campbell's individual liability.

The same is true for Kammer and Kara. Plaintiffs allege that Kammer and Kara were the social workers who coerced them into signing the Prevention Plan in the first place by misinforming them of their rights and telling them that they had to sign the document or else the Schulkers' children would be removed from their care immediately. Moreover, when Plaintiffs' night nurse questioned the document and indicated that in other situations parents had been permitted to leave with their newborns, Kara pulled her aside and stated, "[w]e are supposed be working as a team, why are you pitting them against me?" R. 34, Am. Compl., Pg. ID 515–16.

---

**⁵**It is possible that one could interpret our case law to be somewhat unclear as to whether a plaintiff bringing a substantive due process claim need only show a deprivation of a particular constitutional guarantee, or whether he or she must also show that the government's actions shock the conscience. *Compare Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 728–29 (6th Cir. 2011) *with Siefert v. Hamilton Cty.*, --- F.3d ---, 2020 WL 1023010, at *9 (6th Cir. Mar. 3, 2020). But even if we agreed that there is an incongruity, we need not resolve it today, because no matter whether the standard of *Pittman* or *Siefert* applies, the district court properly denied summary judgment to Defendants. If the *Pittman* standard applies, then Plaintiffs have met their burden by establishing that their fundamental right to parental association without arbitrary government interference was violated. 640 F.3d at 728–29. If Plaintiffs must also show that Defendants' actions shock the conscience, then they have done so by generating evidence that Defendants were, at a minimum, deliberately indifferent to their right to familial association. *See Guertin*, 912 F.3d at 923–24. In particular, we note that Plaintiffs have presented evidence that Campbell disregarded a direct instruction from her supervisor to lift the prevention plan, while Kammer knowingly and actively continued her investigation into the Schulkers for *weeks* after the negative test results were known and Holly's non-use of opiates had been confirmed, going so far as to contact David's ex-wife, the biological mother of E.E.S. and E.M.S., as part of the investigation in late March. Based on the totality of the circumstances—considering "the type of harm, the level of risk of harm occurring, and the time available to consider the risk of harm"—a reasonable juror could find that Defendants' actions shock the conscience as an intentional or deliberately indifferent abuse of power. *Range v. Douglas*, 763 F.3d 573, 591 (6th Cir. 2014).

Following the initial signing of the document, Plaintiffs further allege that Kammer was in part responsible for the CHFS's failure to lift the supervision restrictions even after there was no longer any question as to Holly's parental fitness.  Plaintiffs allege that Kammer received St. Elizabeth's e-mail notifying her that Holly's confirmatory urine test and umbilical cord test results were both negative.  Kammer responded at 3:45 p.m. the day after Holly gave birth to A.M.S. and confirmed that she had received both of the negative test results.  Yet, Kammer has not put on any evidence of her efforts to notify Campbell about these negative test results or otherwise issue a finding of "unsubstantiated."  *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (holding that, on a motion for summary judgment, the movant bears the burden of showing the absence of a genuine dispute of material fact).  Moreover, Plaintiffs allege that Kammer knowingly continued with the investigation by interviewing the Schulkers' children at school two days later and, as late as March, contacting David's ex-wife, the biological mother of E.E.S. and E.M.S., as part of the investigation.  Therefore, at this stage of the proceedings, Plaintiffs have demonstrated a triable issue as to Kammer's and Kara's individual liability for the liberty restrictions that they endured.

### ii.  Procedural Due Process

The district court also correctly found that Defendants are not entitled to qualified immunity on Plaintiffs' procedural due process claim.  In general, "procedural due process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests."  *Pittman*, 640 F.3d at 729 (quoting *Bartell*, 215 F.3d at 557).  To establish a procedural due process violation, Plaintiffs must show (1) that they have been deprived of a cognizable liberty interest, and (2) that such deprivation occurred without adequate procedural protections.  *Id.*; *accord, e.g.*, *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).  As discussed above, Plaintiffs have sufficiently alleged that Defendants' conduct deprived them of a cognizable liberty interest—namely, the right to family integrity and to rear their children without arbitrary government interference.  *E.g.*, *Troxel*, 530 U.S. at 68–69; *Lassiter*, 452 U.S. at 27.  Thus, we must next consider whether that deprivation occurred without adequate procedural protections.

Plaintiffs allege that Defendants did not provide them with any process before or after implementing the supervision restrictions. Specifically, Plaintiffs allege that *before* they were asked to sign the Prevention Plan, Defendant Campbell told Holly that "until this gets figured out you are no longer allowed to be around any children without the supervision of approved individuals." R. 34, Am. Compl., Pg. ID 514. Then, after the conversation with Campbell, and while the toxicology results of the second urine test and umbilical cord test were still pending, Kammer presented Plaintiffs with the Prevention Plan document. According to Plaintiffs, Kammer advised them that if they did not adhere to the Plan, the CHFS would remove all of their children from the house "and after that" seek a court order. From their discussion with Kammer and Campbell, the Schulkers believed that if they did not agree to the Plan at that time, all of the children in their house would be removed from their care. Moreover, the Plan itself states in all capital letters that: "Absent effective preventative services, placement in foster care is the planned arrangement for this child." R. 67-9, Prevention Plan, Pg. ID 1659. In fact, the CHFS had not intended to arrange foster care for any of the Schulkers' children at that time. Instead, the stamped language providing that foster care is the planned arrangement absent effective preventative service is stamped on every prevention plan that the CHFS provides. Given these allegations, the district court correctly found that Plaintiffs presented a triable issue as to whether they voluntarily consented to the Prevention Plan. *Cf. Smith*, 520 F.3d at 599–600 (finding that a state did not need to afford procedural protections upon interference with the parent-child relation where the parents voluntarily agreed to the terms of a safety plan).

In addition, as the district court found, "even if plaintiffs voluntarily consented to the imposition of the Prevention Plan, they did not remain in the 'plan voluntarily at all times.'" *Schulkers*, 367 F. Supp. 3d at 640 (quoting *Smith*, 520 F.3d at 600); *see also Farley v. Farley*, Nos. 98-6114, 98-6115, 2000 WL 1033045, at *5 (6th Cir. 2000) (holding that consent given voluntarily as part of a safety plan in a child abuse investigation can become involuntary during the course of the plan). Plaintiffs allege that they made repeated requests to be released from the Prevention Plan. In addition to objecting at the hospital, Plaintiffs allege that they called Defendants the morning after Holly and A.M.S. were discharged from the hospital and requested that the Plan be lifted. Plaintiffs further allege that they requested the Plan to be lifted throughout that week and on multiple occasions throughout the next six weeks. Nevertheless,

Plaintiffs allege that without affording the Schulkers any process, Defendants continued to impose the Prevention Plan's supervision restrictions until April 7, 2017.  Therefore, the district court correctly found that the Schulkers demonstrated a triable issue of fact as to whether they voluntarily remained under the terms of the Prevention Plan.

In response, Defendants argue that Holly received a service complaint form, which would have notified her of her right to file a service appeal in accordance with Kentucky regulations. However, Defendants did not raise this issue in their motion for summary judgment or otherwise present it before the district court.  Therefore, the argument is forfeited.  *See, e.g.*, *Estate of Barney v. PNC Bank, Nat. Ass'n*, 714 F.3d 920, 925 (6th Cir. 2013) ("In general, we will not review arguments or issues that a party raises for the first time on appeal.").

Moreover, even if Defendants had not forfeited this argument, they would still not be entitled to summary judgment on Plaintiffs' procedural due process claim.  On a motion for summary judgment, even on qualified immunity grounds, we must view all evidence and draw all inferences in favor of the non-moving party.  *Andrews*, 700 F.3d at 852 (citing *Matsushita*, 475 U.S. at 587).  Plaintiffs have alleged that they repeatedly requested for the Plan to be lifted, and Defendants in turn repeatedly denied those requests.  Defendants have not put on any evidence that they discussed Holly's right to a service appeal with her, or otherwise acknowledged that she had such a right in any of these conversations.  In addition, Plaintiffs argue that Holly did not receive the service complaint form that Defendants allege, but rather received  a "Request for Appeal of Child Abuse or Neglect Finding," which Plaintiffs correctly point out would have been useless to Holly, "as there was never a finding of abuse or neglect in this case." Br. for Appellees at 35.  Thus, even if it was not forfeited, Defendants' argument that the service complaint form afforded adequate process relies on genuine factual disputes that must be decided by a jury.

Defendants next contend that the *Parratt-Hudson* doctrine bars Plaintiffs' procedural due process claim, arguing that the state affords Plaintiffs adequate post-deprivation remedies. It appears that Defendants raised this issue in their motion for summary judgment, but the district court did not consider it.

The *Parratt-Hudson* doctrine applies when a state deprives an individual of a cognizable liberty interest "through random and unauthorized conduct of a state employee" such that "predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (quoting *Parratt v. Taylor*, 451 U.S. 527, 541 (1981)). In such situations, courts will allow meaningful postdeprivation procedures to satisfy due process, and the burden is on the plaintiff to show that the state postdeprivation procedures are deficient. *Vicory v. Walton*, 721 F.2d 1062, 1063–64 (6th Cir. 1983).

In *Zinermon v. Burch*, 494 U.S. 113 (1990), the Supreme Court limited the reach of the *Parratt-Hudson* doctrine. In that case, the Supreme Court held that the plaintiff's claim—that state employees at a mental health institution violated his procedural due process rights when they permitted him to consent to commitment to the institution, even though he was incompetent—was not controlled by the *Parratt-Hudson* doctrine. *Id.* at 136. The Court found that the operative inquiry when determining whether the *Parratt-Hudson* doctrine precludes § 1983 liability is "whether predeprivation procedural safeguards could address the risk of deprivations of the kind [the plaintiff] alleges." *Id.* at 132. The Court found that the doctrine did not apply "for three basic reasons." *Id.* at 136. First, the state could not prove that the deprivation of the plaintiff's liberty was "unpredictable." *Id.* Second, the state could not prove that providing predeprivation process would have been "impossible." *Id.* at 136–37. Third, the employees of the mental health institution could not characterize their conduct as "unauthorized" in the sense contemplated by *Parratt* and *Hudson*. *Id.* at 138. This was because "[t]he State delegated to them the power and authority to effect the very deprivation complained of here . . . and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful confinement." *Id.*

Under *Zinermon*, Plaintiffs' procedural due process claim is not barred by the *Parratt-Hudson* doctrine. First, the deprivation that occurred here, as in *Zinermon*, was in no way "unpredictable." *Id.* at 136. Defendants went to the hospital in order to investigate Holly's presumptive positive test result, and they were aware that they might be imposing a Prevention Plan (as evidenced by their taking the form with them). Moreover, Defendant Campbell testified

that the stamped language on the Plan providing that foster care is the planned arrangement absent effective preventative service is stamped on *every* prevention plan that the CHFS provides**.** Similarly, affording the Schulkers predeprivation procedures before imposing the supervision restrictions, or at the very least once the subsequent negative testing revealed that the initial result was a false positive, would not have been "impossible." *Id.* at 137. *Parratt* and *Hudson* contemplate that negligent or intentional unauthorized acts of state employees may render predeprivation procedures "simply 'impracticable' since the state cannot know when such deprivations will occur." *Hudson*, 468 U.S. at 533 (quoting *Parratt*, 451 U.S. at 541). In contrast, Defendants in this case have not presented any reason why they were not fully capable of providing the Schulkers with predeprivation procedures. As the district court correctly found, "the facts do not indicate that any exigency existed." *Schulkers*, 367 F. Supp. 3d at 640. This is especially true after the Schulkers left the hospital and St. Elizabeth notified Defendants that both the confirmatory urine test and the umbilical cord test results were negative. Still, without providing any process, Plaintiffs allege that Defendants left the supervision restrictions in place for approximately two months.

Lastly, and for similar reasons to those just discussed, Defendants' choices here do not constitute the type of "random and unauthorized" conduct that *Parratt* and *Hudson* contemplate. Like the delegation in *Zinermon*, the Commonwealth of Kentucky has delegated to Defendants the authority to inject themselves into the otherwise private realm of family life in order to further the commendable and necessary goals of investigating and ending child maltreatment. *See* Ky. Rev. Stat. § 620.040 *et seq.* (setting forth general scheme of the CHFS's duties and options upon suspicion of child abuse or neglect). By such delegation, Defendants at times are required to interfere with family relations, often by justifiably depriving parents and children of certain liberties. Therefore, Defendants cannot now claim that their actions in this case, which they initially argue were reasonable and in accordance with their own policies, were "random and unauthorized" in order to defeat Plaintiffs' procedural due process claim.**[6]**

---

**[6]**For similar reasons, this Court has found that the applicability of the *Parratt-Hudson* doctrine "is irrelevant to the clearly established prong of the qualified immunity analysis." *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 901 (6th Cir. 2014). "Granting immunity based on the lack of clarity as to whether the *State* bears responsibility would turn the qualified immunity doctrine on its head. The official would in effect be seeking

For these reasons, we find that the district court correctly held that Defendants are not entitled to qualified immunity on Plaintiffs' substantive due process and procedural due process claims. As alleged by Plaintiffs, Defendants imposed the Prevention Plan's supervision restrictions on Holly for approximately two months after there was no longer any question as to Holly's parental fitness without any procedural protections. In so doing, they abridged the Schulkers' clearly established right to the companionship and care of their children without arbitrary government interference in violation of the Due Process Clause of the Fourteenth Amendment.

## CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's order denying qualified immunity to Defendants Kammer and Campbell from suit on Plaintiffs' Fourth Amendment claims because the law governing in-school interviews by social workers was not yet clearly established at the time of Defendants' conduct. We hold that the Fourth Amendment does in fact govern a social worker's in-school interview of a child pursuant to a child abuse investigation, such that, at a minimum, a social worker must have a reasonable suspicion of child abuse before conducting an in-school interview when no other exception to the Fourth Amendment's warrant requirement applies. We **AFFIRM** the district court's order denying qualified immunity to Defendants Kammer, Campbell, and Kara from suit on Plaintiffs' Fourteenth Amendment procedural and substantive due process claims, and **REMAND** the case for further proceedings consistent with this opinion.

---

immunity based on a 'reasonable' belief that his conduct was so wrong—i.e., it was 'random and unauthorized'— that it could not provide the basis for a procedural due process claim." *Id.* (quoting *San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá*, 687 F.3d 465, 500 (1st Cir. 2012) (en banc) (Lipez, J., concurring)). In other words, "[i]t would undermine [qualified immunity's] purpose to find a due process violation but provide no remedy because the defendant could have thought that *Parratt* would let him (and the state) off the hook for his violation of clearly established due process law." *Id.* at 902.