RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0267p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

CHEYENNE JOHNSON, as Next Friend as to X.M., a minor,

*Plaintiff-Appellee*,

*v.*

No. 24-1739

MOUNT PLEASANT PUBLIC SCHOOLS,

*Defendant*,

JASON RUSSELL, in his personal capacity,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:22-cv-12638—Thomas L. Ludington, District Judge.

Decided and Filed:  September 30, 2025

Before:  BATCHELDER, GIBBONS, and BLOOMEKATZ, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Kailen C. Piper, O'NEILL, WALLACE & DOYLE, Saginaw, Michigan, for Appellant.  Herbert A. Sanders, THE SANDERS LAW FIRM, P.C., Detroit, Michigan, for Appellee.

BATCHELDER, J., delivered the opinion of the court in which GIBBONS, J., concurred. BLOOMEKATZ, J. (pp. 13–23), delivered a separate dissenting opinion.

—————————————

**OPINION**

—————————————

ALICE M. BATCHELDER, Circuit Judge.  This is a case about a public-school teacher, Jason Russell, who had good reason to believe that a student, X.M., brought a handgun to school; Russell's actions to protect against that threat; and the lawsuit by Cheyenne Johnson, X.M.'s mother, against Russell for those actions.  In this interlocutory appeal, Russell challenges the district court's denial of qualified immunity on Johnson's claims of Fourth Amendment violations.  The district court denied Russell's motion because it decided that certain disputed facts required a determination by a jury, and our dissenting colleague agrees.  But the critical fact—and arguably the *only* material fact—is not in dispute: Russell had good cause to believe that X.M. might have had a gun at school.  Because the other facts in dispute are not material to Russell's qualified immunity defense, and because Russell—as a matter of law—did not violate X.M.'s clearly established constitutional rights, even under X.M.'s version of the facts, we REVERSE.

**I.**

During the relevant events in 2021, X.M. was a sixth-grade student at Mount Pleasant Public Schools who suffered from Attention Deficit Disorder, Obstruction Defiance Disorder, and severe depression.  Because of these behavioral disabilities, X.M. received his education pursuant to an Individualized Education Plan (IEP).  That IEP—which the school district created in consultation with X.M.'s mother, plaintiff Johnson—allowed X.M. to take breaks throughout the school day in a designated breakroom to help reduce his stress levels because when X.M. became stressed, he would often become angry and violent.  The breakroom is a barren, windowless room that any student may use to take short breaks.  None of this is disputed.

***The gun incidents.***  One day in the fall of X.M.'s sixth-grade year, the school's assistant principal, Matthew Walderzak, received a report from another student that X.M. had brought a gun to school.  Taking that allegation seriously, Walderzak immediately went and asked Jason Russell—X.M.'s special-education teacher—to join him in his search of X.M.'s locker.  Because

the locker was completely empty, Walderzak and Russell went to X.M.'s classroom and took X.M. into the hallway. The two school officials then asked X.M. whether he had brought a gun to school that day, to which X.M. responded, "No." Walderzak and Russell then asked X.M. to pat himself down and to show the inside of his pockets, which X.M. agreed to do. X.M.'s pockets were empty, and so, satisfied that X.M. had not brought a gun to school, the two officials sent X.M. back to class. None of this is in dispute.

The next day, X.M.'s math teacher overheard X.M. laughing with a classmate about that classmate's hand-drawn picture of a gun. Then, when class ended, X.M.'s math teacher heard X.M. shout to another student in the hallway about how "lucky" that student was that X.M. did not have his gun on him that day. Given this gun threat, Walderzak and Russell again searched X.M.'s locker and belongings, but as with their search the day before, they found no gun. Walderzak sent X.M. back into the classroom. None of this is in dispute. And this is the critical fact: at this point, Russell had cause to believe that X.M. might have brought a gun to school, that the gun might be somewhere at the school, and that X.M. might use that gun to commit violence.

The parties dispute what happened next, but we ignore that dispute and consider only X.M.'s version. According to X.M.'s retelling, as soon as he and Russell went back into the classroom, Russell ordered X.M. to take off his pants and then proceeded to strip-search X.M to see if X.M. had a gun. By strip-search, X.M. means that Russell forced him to pull his trousers down and lift his shirt up—not that Russell ordered him to remove his underwear. While X.M. did not have a gun on his person, this would have been a very different case if he had.

***The breakroom incident.*** A few days later, the school suspended X.M. for punching another student in the groin—a suspension that X.M. chose to serve in school the next day. This is not in dispute. The parties dispute what happened when X.M. arrived to serve his suspension, but we again ignore that dispute and consider only X.M.'s version. As X.M. tells it, as soon as X.M. walked into the classroom, Russell ordered him to sit in the designated breakroom and then locked him inside the breakroom for more than 20 minutes. Although the door to the breakroom does not have a lock, X.M. says that one of Russell's assistants used a metal door stopper to jam the door shut from the outside. X.M. had his phone and contacted his mother.

One year later, Cheyenne Johnson—X.M.'s mother—sued Russell, the school district, and five other school officials, alleging that they had each violated her son's constitutional and statutory rights. The defendants then moved for summary judgment, which the district court later awarded to every defendant but Russell. The district court denied Russell qualified immunity as to Johnson's Fourth Amendment claims after it determined that certain disputed facts—namely, whether Russell strip-searched X.M. while looking for the gun, and whether he locked X.M. in the breakroom—required a decision by a jury. Russell now brings this interlocutory appeal.

## II.

Although neither party argues that we lack jurisdiction to decide this appeal, we have an independent obligation to ensure that jurisdiction exists. *See, e.g.*, *Lindke v. Tomlinson*, 31 F.4th 487, 494 (6th Cir. 2022). The denial of summary judgment is ordinarily not a final decision within the meaning of 28 U.S.C. § 1291, so it is generally not immediately appealable. But the "denial of a claim of qualified immunity, to the extent that it turns on a question of law, is an appealable 'final decision' within the meaning of [] § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). That means that on an interlocutory appeal from the denial of qualified immunity, we may decide a challenge to the district court's legal determination that the defendant's actions violated a clearly established constitutional right. *Id.* It also means that we may decide a challenge to a legal aspect of the court's factual determinations, such as whether the court properly assessed the incontrovertible record evidence. *Plumhoff v. Rickard*, 572 U.S. 765, 772-73 (2014); *Roberson v. Torres*, 770 F.3d 398, 402 (6th Cir. 2014). And it means that we may decide, as a legal question, a challenge to the court's factual determination when the challenge contests that determination as "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (6th Cir. 2007).

What we may not do, however, is decide a challenge to the district court's determination of "evidence sufficiency, *i.e.*, which facts a party may, or may not, be able to prove at trial." *Johnson v. Jones*, 515 U.S. 304, 313 (1995) (quotation marks omitted). Because such a challenge is purely fact-based, it "does not present a legal question" that can be reviewed in an

interlocutory appeal. *Plumhoff*, 572 U.S. at 772. The Supreme Court has found these types of prohibited fact-based appeals in challenges to the plaintiff's allegations of "what [actually] occurred[] or why an action was taken or omitted," *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011), to who took those actions, *Johnson*, 515 U.S. at 307, or to "whether the evidence could support a [jury's] finding that particular conduct occurred," *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996). Put more simply, "*Johnson* applies to interlocutory appeals that solely contest the plaintiff's account of the facts." *Fam. Serv. Ass'n ex rel. Coil v. Wells Twp.*, 783 F.3d 600, 607 (6th Cir. 2015).

So to summarize and put these "mays" and "may nots" together into a single jurisdictional rule, we may not decide a challenge aimed solely at the district court's determination that disputed facts that are germane to the outcome require a finding or decision by a jury, but we may decide a challenge with any legal aspect to it, regardless of whether it might encroach on the district court's own fact-based determinations. *See, e.g.*, *Behrens*, 516 U.S. at 312-13 ("Denial of summary judgment often includes a determination that there are controverted issues of material fact and *Johnson* surely does not mean that every such denial of summary judgment is nonappealable.").[1]

True, after *Johnson*, panels cited the district court's finding of factual disputes to dismiss such interlocutory appeals for lack of jurisdiction. But at least since the Supreme Court's decision in *Plumhoff*, we have used a different approach in which we excise the prohibited fact-

---

[1]*Behrens* provides a useful clarification of *Johnson* and, considering the two cases together, shows that we cannot sidestep our appellate jurisdiction by pointing to the immaterial factual disputes between Russell and X.M.:

> Second, respondent asserts that [an] appeal of [the] denial of the summary-judgment motion is not available because the denial rested on the ground that material issues of fact remain. This, he contends, renders the denial unappealable under last Term's decision in *Johnson v. Jones* []. That is a misreading of the case. Denial of summary judgment often includes a determination that there are controverted issues of material fact, and *Johnson* surely does not mean that every such denial of summary judgment is nonappealable. *Johnson* held, simply, that determinations of *evidentiary sufficiency* at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case; if what is at issue in the *sufficiency determination* is nothing more than *whether the evidence could support a finding* that particular conduct occurred, the question decided is not truly separable from the plaintiff's claim, and hence there is no 'final decision' under *Cohen* and *Mitchell*.

*Behrens*, 516 U.S. at 312-13 (editorial marks, quotation marks, and citations omitted; emphasis added); *see also DiLuzio*, 796 F.3d at 610 (citing *Beherns* for this same point). There is no sufficiency issue in this appeal.

based challenges so as to properly accept our jurisdiction. *See DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 610 (6th Cir. 2015) ("*Plumhoff* appears to cabin the reach of *Johnson* to *purely* factual issues that the trial court might confront if the case were tried." (quotation marks omitted; emphasis in original)). Under this approach, when legal and factual challenges are confused or entwined, "we must separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is genuine)." *Roberson*, 770 F.3d at 402 (quoting *Johnson*, 515 U.S. at 319) (quotation marks omitted). Or put another way, we "can ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (deciding a legal issue based on the plaintiff's record facts). By ignoring the defendant's attempts to dispute the facts, we follow the same path as the district court—considering the sufficiency of the plaintiff's proffered evidence, drawing all reasonable inferences in the plaintiff's favor, and making the legal determination of whether the defendant violated a clearly established right based on those now (at least for purposes of this appeal) undisputed record facts. *Scott*, 550 U.S. at 381 n.8.; *DiLuzio*, 796 F.3d at 611. This approach not only furthers both the case and the caselaw but also fulfills our duty to decide the cases appropriately before us. *See, e.g.*, *FBI v. Fikre*, 601 U.S. 234, 240 (2024) ("A court with jurisdiction has a virtually unflagging obligation to hear and resolve questions properly before it." (quotation marks omitted)).

So, as applied here, these principles mean that for purposes of this appeal, we accept X.M.'s version of the events as "undisputed" and analyze the legal issues based on those facts.[2]

---

[2]The factual disputes, such as they are, concern Russell's denial of two of X.M.'s accusations: (1) "Russell ordered him to drop his pants when searching X.M. for weapons," and (2) "Russell locked him in a small room without windows for twenty minutes." *See* Dis. Op. at 1. Obviously, this is not a question of evidence sufficiency. X.M. could testify about these two accusations and that testimony would be sufficient on its own to support a jury's finding in his favor, regardless of anything that Russell might have to say about it. At that point, procedurally, the court would consider judgment as a matter of law, Fed. R. Civ. P. 50, formerly known as a judgment notwithstanding the verdict.

In that sense, we are now—by presumption—at the judgment notwithstanding the verdict stage. We assume that the jury has ruled in favor of Johnson and X.M. and the purely legal questions are (1) do Russell's actions violate the Constitution and (2) was that clearly established at the time. There is no remaining factual dispute.

**III.**

Qualified immunity shields government officials from suit unless those officials (1) violated a constitutional right that (2) was clearly established when the conduct occurred. *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022). Proving that a constitutional right is clearly established is no easy task, however, and doing so requires a plaintiff to show that two things are true. First, the rule establishing the right must be "settled," meaning that it is "dictated by controlling authority" and not merely "suggested by then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). And second, the rule must "clearly prohibit the [official's] conduct in the particular circumstances before him." *Id.* It is not enough, in other words, for the plaintiff to identify a case that "merely stand[s] for [a] general proposition." *Bell*, 37 F.4th at 367. Read together, these two principles require that the precedent be "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 583 U.S. at 63. In deciding qualified immunity defenses, we can address these two prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Importantly, for present purposes, "[t]he plaintiff bears the burden of showing that an offic[ial] is not entitled to the defense of qualified immunity." *Rafferty v. Trumbull Cnty.*, 915 F.3d 1087, 1093 (6th Cir. 2019) (editorial marks, quotation marks, and citations omitted)). Therefore, it was Johnson's burden to produce evidence and cite applicable law to prove that Russell was not entitled to qualified immunity; Russell had no burden to prove anything. So, unless Johnson has stated a legally viable claim of a violation of a clearly established right, with supporting precedent, Russell is entitled to qualified immunity. *See Mitchell*, 472 U.S. at 526 ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.").

**A.**

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches." U.S. Const. amend. IV. While this prohibition against unreasonable searches most often applies to police officers, it also applies to

public-school officials. *New Jersey v. T.L.O.*, 469 U.S. 325, 333 (1985). To determine whether a search is unreasonable in the public-school context, we engage in a "twofold inquiry." *Id.* at 341. First, we decide whether the search was "justified at its inception," *id.* (quotation marks omitted), which will be true whenever a school official believes that he or she has a "moderate chance of finding evidence of wrongdoing," *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371 (2009). And second, if the search was justified at its inception, we must then decide whether "the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 469 U.S. at 341 (quotation marks omitted). The scope of a search will be permissible when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342 (footnote omitted).

Here, the district court framed Johnson's claim as alleging that the search exceeded its permissible scope when Russell ordered X.M. to remove his pants. But it is impossible to find that allegation anywhere in Johnson's complaint or summary judgment briefing. Simply put, Johnson did not raise that claim, the district court did. In her response to Russell's motion for summary judgment, Johnson dedicated a single paragraph to the Fourth Amendment, and that paragraph focused entirely on Fourth Amendment *seizures*. In her complaint—even construing it most liberally—Johnson never alleged that there was an unlawful search. Her complaint mentions the Fourth Amendment only four times and even then, only in the context of her claim for *deliberate indifference*. The district court appeared to admit as much when it qualified its re-framing of Johnson's claim by saying that Johnson "seemingly" alleged a Fourth Amendment claim. In other words, rather than accept and analyze Johnson's claims as she presented them, the district court appears to have abandoned its role as "neutral arbiter" and improperly created and analyzed its own Fourth Amendment argument. *See Greenlaw v. United States*, 554 U.S. 237, 243 (2008).

But even if we set that aside and apply the ordinary twofold inquiry for public-school searches described above, *see T.L.O.*, 469 U.S. at 341, the outcome would still be the same: Russell's conduct—as Johnson and X.M. describe it—did not violate X.M.'s constitutional rights. First, there can be no doubt that Russell's decision to search X.M. was justified at its

inception.  Indeed, consider that (1) X.M. was a student with established behavioral issues (that demanded an IEP on that basis) and a documented history of violence towards others; (2) X.M. told another student about how "lucky" that student was that X.M. did not have his gun with him that day; and (3) this gun threat occurred only one day after a separate student reported that X.M. had brought a gun to school.  Given all this, Russell reasonably believed that he had a "moderate chance of finding evidence of wrongdoing" when he strip-searched X.M.  *See Safford*, 557 U.S. at 371.  In fact, Russell had reason to believe he might find a gun.  To be sure, this court has not yet decided what circumstances would give a school official reasonable suspicion to search a student and his belongings for a gun.  But in cases with facts similar to these, other circuits have found that reasonable suspicion exists.  *See Wofford v. Evans*, 390 F.3d 318, 326 (4th Cir. 2004) (holding that school officials had reasonable suspicion when a student reported that another student brought a gun to school); *Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 968-70 (11th Cir. 2002) (holding that school officials had reasonable suspicion when the student created violent drawings and used threatening words).  And Johnson certainly has not offered us any argument to suggest that school officials would not have reasonable suspicion in circumstances like these.

Second, given the facts here—as presented by Johnson and X.M.—and the state of our caselaw, it was not clearly established that Russell had exceeded the permissible scope of his search for a gun in a school when he ordered X.M. to take off his trousers.  Indeed, Johnson cannot point to a single decision from either this court or the Supreme Court that forbids school officials from directing a student to remove his pants when those officials have reasonable suspicion to believe that the student may have a gun—a failure that dooms Johnson's claims.  *See Bell*, 37 F.4th at 367 ("The plaintiff bears the burden of showing that the right was clearly established.").

In holding otherwise, the district court relied solely on the Supreme Court's decision in *Safford*, but that case merely held that school officials cannot search a student's underwear for pain-reliever medicine unless those officials have "reason to suspect that large amounts of drugs were being passed around, or that individual students were receiving great numbers of pills." *Safford*, 557 U.S. at 375-76.  Importantly, the Supreme Court went on to explain that school

officials *can* search a student's intimate body parts if those officials have a "reasonable suspicion of danger." *Id.* at 377. So, because Russell was searching the inside of X.M.'s trousers for a gun—a weapon that obviously presents a serious danger in a school—*Safford* does not clearly prohibit Russell's conduct here. *See Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (explaining that "existing precedent must have placed the statutory or constitutional question beyond debate" (quotation marks omitted)).

**B.**

The Fourth Amendment also guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable . . . seizures." U.S. Const. amend. IV. Relying on this guarantee against unreasonable seizures, Johnson argues that Russell violated her son's clearly established rights when he locked X.M. in the breakroom for 20 minutes. Recall that this occurred when X.M. was serving an in-school suspension for a violent act (punch) on another student and just days after the alarming suspicion that X.M. had brought a gun to school.

Regardless of the circumstances, which are undisputed, Russell is entitled to qualified immunity on Johnson's unreasonable-seizure claim under the Fourth Amendment because it was not clearly established then (or now) that Russell's conduct violated the Fourth Amendment. Indeed, this court has never decided in a published opinion whether or how the Fourth Amendment's guarantee against unreasonable seizures applies in the public-school context. *See Bell*, 37 F.4th at 367-68 (explaining that only published decisions can clearly establish a rule). And that means that Johnson cannot point to any published decision that would show that the alleged unconstitutionality of Russell's conduct was "so well defined" that no reasonable official could conclude otherwise. *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam) (quotation marks omitted).

In arguing that Russell violated her son's clearly established rights, Johnson relies solely on our unpublished decision in *Crochran ex rel. Shields v. Columbus City Schools*, 748 F. App'x 682 (6th Cir. 2018). But even if that were an appropriate citation, *Crochran* does not clearly establish the unconstitutionality of Russell's conduct. There, this court determined that public-school officials seize a student under the Fourth Amendment when they impose a "limitation on

the student's freedom of movement" that "significantly exceed[s] that inherent in every-day compulsory attendance." *Id.* at 685 (quoting *Couture v. Bd. of Educ. of Albuquerque Pub. Schs.*, 535 F.3d 1243, 1251 (10th Cir. 2008)). Nothing about that amorphous standard would put Russell on notice that his actions here—as described by Johnson and X.M.—would violate the Fourth Amendment's guarantee against unreasonable seizures. *See Wesby*, 583 U.S. at 63 (explaining that a clearly established rule must be "dictated by controlling authority," not simply "suggested by then-existing precedent" (quotation marks omitted)).

Our dissenting colleague suggests that this court has already addressed whether "teachers can lock behaving students in cell-like room for twenty minutes," and relies on *Schulkers v. Kammer*, 955 F.3d 520, 536-37 (6th Cir. 2020), as clearly established precedent for a Fourth Amendment violation when they "hold the student in 'a room' with the door 'shut' for 'thirty minutes.'" Dis. Op. at 12. But *Schulkers* was not a case about a troublesome student, a violent student, or a student who had repeatedly been suspected of bringing a gun to school. Nor was it about teachers. It was about social workers investigating accusations of parental child abuse.

> For the reasons that follow, we find that [school children] did not have a clearly established Fourth Amendment right to be free from warrantless, in-school interviews by social workers investigating child abuse at the relevant time. This is because our precedent is unclear about the role of the Fourth Amendment in the specific factual circumstances alleged here, *i.e.*, when social workers perform an in-school interview of a child pursuant to an abuse investigation. However, we also exercise our discretion to consider the second prong of the qualified immunity inquiry and conclude that [the social workers'] alleged conduct in this case was unconstitutional. We hold that, at a minimum, social workers investigating child abuse must have some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse before seizing a child from his or her school classroom without a warrant and when no other exception to the warrant requirement applies.

*Schulkers*, 955 F.3d at 533-34 (quotation marks and citations omitted). Thus, the reliance on *Schulkers* appears to prove—rather than disprove—the absence of clearly established law. *See Wesby*, 583 U.S. at 63.

Nor have other circuits reached a "robust consensus" on this question. *See Plumhoff*, 572 U.S. at 780 (explaining that a rule can be clearly established through a "robust consensus of cases of persuasive authority" (cleaned up)). For example, the Tenth Circuit uses the same

standard and looks to whether the restriction "exceed[ed] that inherent in every-day, compulsory attendance," *Couture*, 535 F.3d at 1251, while the Seventh Circuit looks to whether the "restriction of liberty is unreasonable under the circumstances then existing and apparent," *Wallace ex rel. Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1013-14 (7th Cir. 1995) (explaining how the Fourth Amendment's guarantee against unreasonable seizures fits poorly with public schools). And the Ninth Circuit recently declined to adopt any standard, explaining that it was aware of "few, if any, cases in which qualified immunity was denied to a teacher or school official who used physical restraints or seclusion in the course of their 'custodial and tutelary responsibility.'" *A.T. ex rel. L.T. v. Baldo*, 798 F. App'x 80, 84 (9th Cir. 2019) (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995)). In fact, the Ninth Circuit further observed that "in all cases in this area where Fourth Amendment violations have been found, the teacher or school official's actions clearly fell under the rubric of arbitrary and excessive corporal punishment." *Id.* at 84 (quotation marks omitted). In sum, then, it was not clearly established that Russell's conduct violated the Fourth Amendment's guarantee against unreasonable seizures.

## IV.

Because Russell did not violate X.M.'s clearly established constitutional rights, even under Johnson's and X.M.'s version of the facts, we **REVERSE** the decision of the district court and remand with instructions to dismiss the Fourth Amendment claims against Russell.

––––––––––––––––––

**DISSENT**

––––––––––––––––––

BLOOMEKATZ, Circuit Judge, dissenting.   When reviewing a denial of qualified immunity on an interlocutory basis, our jurisdiction is limited: We can review pure questions of law, but not disagreements over disputed facts.  *Heeter v. Bowers*, 99 F.4th 900, 908–09 (6th Cir. 2024).    Because of this limitation, we require defendants seeking our rare interlocutory jurisdiction to concede the facts for the purpose of appeal and advance pure legal arguments that we can review.  *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998).  By contrast, when defendants persist with their factual disputes and rest their legal arguments on their view of the record, we lack jurisdiction.  *Adams v. Blount County*, 946 F.3d 940, 950–51 (6th Cir. 2020). That is what Jason Russell does here.  And that is why, in my view, we lack jurisdiction over this appeal.

In this interlocutory appeal, Russell's legal arguments are predicated on his view of the facts.  He says that he is entitled to qualified immunity on X.M.'s two Fourth Amendment claims because, quite simply, he did not do what X.M. accuses him of.  *First*, X.M. claimed that Russell violated his Fourth Amendment right to be free from unreasonable searches because Russell ordered X.M. to drop his pants when searching X.M. for weapons.  In response, Russell does not argue that this search was constitutionally permissible or failed to violate clearly established law. Instead, he says he did not order X.M. to drop his pants, and so the search was reasonable. *Second*, X.M. claimed that Russell violated his Fourth Amendment right to be free from unreasonable seizures because Russell locked him in a small room without windows for twenty minutes.  Again, Russell does not argue that this seizure was constitutionally permissible or failed to violate clearly established law.  Instead, he says he did not lock X.M. in a room, and thus there was no seizure.  Russell, therefore, bases his argument that he did not violate the Fourth Amendment and is entitled to qualified immunity on his own disputed version of the facts.

For both claims, Russell could have argued that he did not violate X.M.'s constitutional rights or clearly established law even under X.M.'s version of what happened.  A majority of this

panel would have agreed with him. But he did not advance those arguments, and I would not construct them sua sponte to give us jurisdiction where there otherwise is none. By centering his legal arguments on his disputed view of the facts, Russell leaves us with no reviewable argument at this interlocutory stage. I would dismiss the appeal for lack of jurisdiction, so I respectfully dissent.

**BACKGROUND**

I begin by setting out the facts and the ways in which the parties' accounts diverge.

X.M. attended sixth grade at Mount Pleasant Middle School, a public school in Michigan. He struggled with attention deficit disorder, oppositional defiant disorder, and severe depression—conditions that made school life a challenge. X.M. relied on special education services for help in managing these challenges. In the fall of sixth grade, Jason Russell was his primary special education teacher.

*Search Incident.* That fall, a student falsely reported that X.M. claimed to have brought a gun to school. In response, Russell and the school's assistant principal looked inside X.M.'s locker, but they did not find any weapons there. Then they removed X.M. from class and searched him in the hallway. In particular, they asked X.M. to pat himself down and empty his pockets, but that too yielded no weapon. X.M. does not claim that these searches violated his rights in any way.

The next day, another teacher overheard X.M. laughing with a classmate about that classmate's drawing of a gun. After class, the teacher also heard X.M. shout at a student in the hallway, "you're lucky I don't have my gun on me today!" Op. & Order, R. 65, PageID 3192 (cleaned up). That statement prompted Russell and the assistant principal to repeat the same searches as the day before. Again, they uncovered no weapon. And X.M. does not challenge the lawfulness of these searches either.

Security camera footage shows that after this second hallway search, Russell led X.M. to the special education classroom. But the parties disagree on what happened inside the classroom, where there were no security cameras. X.M. says that Russell took him to the

classroom to strip search him for weapons in private. In particular, X.M. says Russell continued to search him by ordering him to pull down his pants and lift his shirt. Russell denies doing so and says he merely instructed X.M. to take a short break to recover from the hallway search.

*Seizure Incident.* A few days later, three students "jumped" X.M. in a school bathroom. *Id.* at PageID 3209 (citation omitted). Then, some hours later, X.M. punched one of those students in the groin. For this misconduct, the school punished X.M. with an in-school suspension. X.M. reported to Russell's classroom on the morning of his scheduled in-school suspension, at which point everyone agrees he was not exhibiting any disruptive or violent behavior.

Once again, the parties disagree on what happened. X.M. says that as soon as he arrived in Russell's classroom, Russell ordered him into the so-called "Break Room." The Break Room was a small room within the larger special education classroom where students took breaks. According to Russell, the breaks were supposed to last for "only" "three to five minutes." Appellant Br. at 7. They were largely initiated by students, though Russell could also direct a student to the Break Room if the student was physically "out of control" or posed a "danger to themselves or others." Op. & Order, R. 65, PageID 3194 (quoting Russell Dep., R. 41-3, PageID 508).

Despite its euphemistic name, the Break Room had the features of a holding cell. It was a stark white space with no furniture—no chair or desk, for example. It had no windows, except a small window in the door, which was covered on the outside with a piece of paper, blocking the ability of anyone inside the room to see out. And while the room's door did not have a lock, X.M. says he had seen staff use large metal doorstops to shut students in the room.

X.M. claims that after Russell ordered him into the Break Room, either Russell or his assistant closed the door and wedged one of those metal doorstops behind it. X.M. tried to push the door open but could not do so. Unable to leave, he sat on the floor of the otherwise empty room and waited. While in the room, X.M. recorded a video with his cellphone and sent it to his mother. Alarmed, X.M.'s mother texted Russell to release X.M. from the room, which Russell did. By then, X.M. had been inside the room for twenty minutes.

Russell, meanwhile, denies either ordering or trapping X.M. inside the Break Room. On Russell's telling, X.M. freely entered the Break Room as soon as he arrived that morning and partly closed the door behind him. Russell insists that no one then wedged a doorstop behind the door. And he says X.M. was free to leave the room if he wanted.

Acting through his mother, X.M. sued Russell for allegedly violating his Fourth Amendment rights. Russell, a state employee, moved for summary judgment based on qualified immunity. The district court reviewed the record and found that the parties told "starkly" different stories. *Id.* at PageID 3187. Viewing the facts in X.M.'s favor, the court ruled that genuine and material disputes of fact precluded summary judgment. Russell brought this interlocutory appeal.

**ANALYSIS**

On appeal, the parties' disparate views of the facts continue to drive their arguments. On the one hand, X.M. says that Russell violated his Fourth Amendment rights in two ways: *first*, by asking him to lower his pants during the weapon search, and *second*, by confining him in the Break Room a few days later. On the other hand, Russell says he is entitled to qualified immunity because he did not take either of those actions. The centrality of these dueling accounts presents a serious problem for our interlocutory jurisdiction, which we have an independent duty to confirm. *See Wilhelm v. Boggs*, 290 F.3d 822, 824 (6th Cir. 2002).

*Interlocutory Jurisdiction.* In an interlocutory qualified immunity appeal, our jurisdiction is limited. We can review "purely legal" issues. *Johnson v. Jones*, 515 U.S. 304, 313 (1995). But we cannot resolve "quarrel[s] with the plaintiff's record-supported facts, which the district court must adopt at summary judgment." *Heeter*, 99 F.4th at 908. That means if the defendant argues that they are entitled to qualified immunity under the plaintiff's facts, we have jurisdiction. *Id.* at 909. But if the defendant argues only that the plaintiff's record-supported facts are incorrect, we must dismiss the appeal for lack of jurisdiction. *Perez v. Simpson*, 83 F.4th 1029, 1031 (6th Cir. 2023).

This fact-law dichotomy traces back to the Supreme Court's decision in *Johnson v. Jones*. There, the plaintiff sued several police officers for allegedly beating him after an arrest.

*Johnson*, 515 U.S. at 307.  The officers moved for summary judgment, arguing that they did not beat the plaintiff and were not even present during the alleged incident.  *Id.*  The district denied the officers' motion, reasoning that the plaintiff's account could support liability, and that there was enough evidence to allow a jury to believe the plaintiff.  *Id.* at 308.  The officers appealed, still insisting that they were not involved in the alleged beating.  *Id.* at 307–08.  But the Seventh Circuit held that the officers' "we didn't do it" arguments fell outside its interlocutory jurisdiction.  *Id.* at 308.  The Supreme Court agreed, explaining that in an interlocutory qualified immunity appeal, our jurisdiction extends only to a "purely legal" question: whether the plaintiff's facts, taken as true, can defeat qualified immunity.  *Id.* at 313.  We do not have jurisdiction to resolve "evidence sufficiency" disputes—that is, disputes over which facts the plaintiff "may, or may not, be able to prove at trial."  *Id.*

Since *Johnson*, we have "consistently" rejected appeals that only quarrel with the plaintiff's facts.  *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 277 (6th Cir. 2020) (collecting cases).  And we have "repeatedly" explained that for us to have jurisdiction, the defendant must be willing to concede the most favorable view of the facts to the plaintiff.  *Id.*; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).

There is one exception to these limitations:  A defendant does not have to concede facts that are "blatantly contradicted" by the record, such that "no reasonable jury could believe [them]." *Scott*, 550 U.S. at 380–81.  But a defendant's own dueling testimony is not the kind of evidence that satisfies the high bar for this exception.  *Younes v. Pellerito*, 739 F.3d 885, 889 (6th Cir. 2014).

Applying *Johnson*'s fact-law distinction is not always easy.  *Heeter*, 99 F.4th at 909; 15A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3914.10 (3d ed. Supp. 2025).  Many qualified immunity appeals present both factual and legal challenges, leaving us to untangle the factual issues from the legal ones.  That task is easy enough when the defendant's legal and factual arguments are "discrete" and separable.  *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002).  For instance, a defendant might dispute the facts but concede them in the alternative, or raise arguments that rest on undisputed facts alone.  *See Est. of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 528–29, 529

n.10 (1985). In those situations, we can "excise" the appeal's factual arguments and resolve the legal ones that remain. *Bunkley v. City of Detroit*, 902 F.3d 552, 560 (6th Cir. 2018). But separating an appeal's factual and legal challenges is not always straightforward. For example, a defendant might argue that the plaintiff's rights were not clearly established—a generally legal issue—but solely on the ground that the plaintiff's record-supported facts are incorrect. In that scenario, the defendant's factual challenges are "crucial" to the appeal because they "serve as the basis for [the defendant]'s legal argument." *Adams*, 946 F.3d at 951; *Gillispie v. Miami Township*, 18 F.4th 909, 917 (6th Cir. 2021). When factual disputes drive a defendant's legal arguments in that way, we cannot ignore them and must dismiss the appeal for lack of jurisdiction. *Adams*, 946 F.3d at 951.

In Russell's appeal, the factual disputes are crucial. Russell argues that he did not violate X.M.'s Fourth Amendment rights against unreasonable searches and seizures—the first prong of the qualified immunity analysis. *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022). But in doing so, Russell only insists that, contrary to X.M.'s testimony, he did not do what X.M. claims.

*Unreasonable-Search Claim.* To understand why we have no jurisdiction, start with Russell's arguments on X.M.'s unreasonable-search claim. Under the Fourth Amendment, a school search is lawful if it is reasonable. *Knisley v. Pike Cnty. Joint Vocational Sch. Dist.*, 604 F.3d 977, 979 (6th Cir. 2010). A school search is reasonable if it is (1) justified at its inception, and (2) reasonably related in scope to its initial justification. *Id.* Given X.M.'s references to gun possession, no one disputes that Russell's decision to search X.M. for weapons was justified at the outset. The parties disagree on the second element: whether Russell exceeded the search's lawful scope by asking X.M. to remove his pants after a less intrusive search—including a pat-down—revealed no signs of a weapon.

Russell offers only one reason for why he should prevail on this element: He "*never* asked X.M. to pull down his pants or lift his shirt." Appellant Br. at 12. According to Russell, the second search "was limited to . . . looking in [X.M.]'s locker and asking him to pat himself down and show the inside of his pockets." *Id.* at 21. And since everyone agrees that these actions were reasonable, Russell contends that the search was "appropriately limited in scope

under the Fourth Amendment." *Id.* But Russell's argument simply disregards X.M.'s dueling testimony, according to which Russell ordered X.M. to remove his pants after a less intrusive search. Russell makes no argument for why he is entitled to qualified immunity under X.M.'s record-supported version of events. His appeal on this claim thus lies beyond our jurisdiction.[1]

*Unreasonable-Seizure Claim.* Now consider Russell's defense to X.M.'s unreasonable-seizure claim. X.M.'s claim requires evidence (1) that X.M. was seized, and (2) that his seizure was unreasonable. *See Shields ex rel. Crochran v. Columbus City Schs.*, 748 F. App'x 682, 685 (6th Cir. 2018). In response, Russell focuses his entire argument for qualified immunity on the first element: whether he seized X.M. on the morning of X.M.'s in-school suspension. And that argument is purely factual. Once again, Russell fights X.M.'s account of what happened. Russell insists that, contrary to what X.M. claims, X.M. "chose" to go the Break Room "by himself"; the room's door remained "open"; and X.M. was "free to leave" the room whenever he wanted. Appellant Br. at 10, 19, 22.

To bolster his factual argument, Russell relies on more than his own disputed testimony; he also points to a video and text message that X.M. sent from inside the Break Room to his mother. But neither piece of evidence "blatantly contradict[s]" X.M.'s account, which is necessary for us to have jurisdiction here. *Scott*, 550 U.S. at 380. For a brief moment, the blurry video gives a glimpse of what looks like a slightly open door. But there is no reason why the door could not have been both slightly ajar and jammed from the outside with a doorstop, as X.M. claims. *See Heeter*, 99 F.4th at 912 (noting our obligation to construe "gaps or uncertainties" in videos in the non-movant's favor). Indeed, from the video's vantage point inside the room, we can briefly see what looks like a doorstop wedged underneath the door.

X.M.'s text to his mother is similarly ambiguous. In the text, X.M. warned his mother that he was about to run from the Break Room to a nearby gas station. A jury could read that

---

[1]Russell's only purely legal argument in the entire appeal comes in his reply brief, where he asserts in only a few sentences that he would not have exceeded the search's permissible scope even if he had asked X.M. to remove his clothing. We usually do not address arguments first made on reply. *See Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 545 (6th Cir. 2000). Far from a real concession of the facts, *Anderson-Santos v. Kent County*, 94 F.4th 550, 554 (6th Cir. 2024), this half-hearted afterthought is not sufficient in my view to invoke our jurisdiction.

text to show that X.M. was free to leave the Break Room, as Russell does. But the jury could also view the text as expressing the desire of a boy with behavioral challenges to escape (not just the room, but the entirety of campus). It could see the text as an empty threat of absconding meant to get X.M.'s mother's immediate attention in a stressful situation. Or the jury could even find that X.M. sent the text before he realized that the door to the Break Room would not open. Those inferences would all be reasonable. *See Judd v. City of Baxter*, 780 F. App'x 345, 349 (6th Cir. 2019). And that means the record fails to "utterly discredit" X.M.'s version of events. *Scott*, 550 U.S. at 380.

In short, Russell's arguments all rest on his own version of disputed facts. Russell maintains that, contrary to X.M.'s testimony, he never asked X.M. to lower his pants or locked X.M. in the Break Room. These "I didn't do it" arguments are precisely what *Johnson* says we lack jurisdiction to consider. And because that is all Russell argues here, we must dismiss his appeal for lack of jurisdiction. *Adams*, 946 F.3d at 951.

*The Majority Opinion.* If Russell's fact-based denials fall outside our interlocutory jurisdiction, that begs the question: What is the majority opinion resolving? The majority opinion rightly does not address Russell's prohibited fact-based arguments. It instead construes the facts in the light most favorable to X.M., as is required at the summary judgment stage. The majority thus assumes that Russell forced X.M. to drop his pants when he was searching X.M. for weapons, and that Russell later locked X.M. in the Break Room for twenty minutes. The majority opinion then decides, with this view of the facts, whether Russell violated X.M.'s clearly established rights under the Fourth Amendment. I agree that if Russell had raised this question, we would have jurisdiction to review it. *Adams*, 946 F.3d at 950. But Russell did not raise it. He did not raise a "clearly established" argument at all, nor did he argue any aspect of qualified immunity based on X.M.'s facts.

As an initial matter, both on appeal and before the district court, Russell failed to argue that X.M.'s alleged Fourth Amendment rights were not clearly established. As the majority opinion explains, the qualified immunity analysis involves two prongs: (1) whether Russell violated X.M.'s constitutional rights and (2) whether those rights were clearly established. Maj. Op. at 7. As I explained, Russell argues that he did not violate X.M.'s constitutional rights

solely because he did not do what X.M. claims.  Russell did not make any argument on the second prong—whether X.M.'s claimed rights were clearly established.  By that, I do not mean that Russell raised a "clearly established" argument in a "skeletal way." *Cockrun v. Berrien County*, 101 F.4th 416, 419 (6th Cir. 2024) (citation omitted).  I mean that he never asserted, even in passing, that X.M.'s claims fail this prong of the qualified immunity analysis.  Russell acknowledged this prong only when reciting the "two-part" framework for analyzing a qualified immunity defense.  Appellant Br. at 20–21.  But his briefs otherwise focused entirely on whether he violated X.M.'s Fourth Amendment rights, not on whether those rights were clear at the time he acted.  Russell thus forfeited the "clearly established" prong of his defense. *Ashford v. Univ. of Mich.*, 89 F.4th 960, 974–75 (6th Cir. 2024); *Banas v. Hagbom*, 806 F. App'x 439, 442 (6th Cir. 2020).  The majority provides no convincing explanation for why it nonetheless chooses to reach this issue, even as it chastises the district court for reaching other issues the majority deems forfeited.  Maj. Op. at 8.

Nor has Russell advanced any arguments based on X.M.'s facts.  Sure, Russell could have argued, perhaps in the alternative, that he did not violate clearly established law even under X.M.'s version of events.  But Russell did not make that argument, and the majority's approach—to go ahead and decide it anyway—is hard to reconcile with our precedents.  In the past, we have routinely dismissed qualified immunity appeals where the defendant "could have" raised reviewable "legal arguments" but failed to do so. *McKenna v. City of Royal Oak*, 469 F.3d 559, 562 (6th Cir. 2006); *accord Barry v. O'Grady*, 895 F.3d 440, 444 (6th Cir. 2018); *Banas*, 806 F. App'x at 442; *Kollin v. City of Cleveland*, 557 F. App'x 396, 402 (6th Cir. 2014).  We have not simply "ignore[d]" the defendant's fact-driven arguments in such cases, Maj. Op. at 3, no matter how "meritorious" a qualified immunity defense may otherwise appear, *Phelps*, 286 F.3d at 298.  And in the rare cases where we have reached past "the defendant's attempts to dispute the facts and nonetheless resolve[d] the legal issue," Maj. Op. at 6 (quoting *Est. of Carter*, 408 F.3d at 310), we have done so when "*the defendant also raises* the purely legal question of whether the facts alleged" amount to a "violation of clearly established law," *Est. of Carter*, 408 F.3d at 310 (emphasis added) (citation omitted).  Unlike *Estate of Carter*, which the majority relies on to give itself jurisdiction, Russell did not raise a "clearly established" argument.  The majority opinion does not even contend that he did.

As purported justification for reaching the "clearly established" prong, the majority gestures to Johnson's burden to "prove that Russell was not entitled to qualified immunity." Maj. Op. at 7. But that reasoning conflates the burden of proof and the burden to raise an argument. While Johnson has the ultimate burden of proof, that burden is only triggered if Russell raised a "clearly established" argument in the first place. Otherwise our previous holdings that defendants forfeit a "clearly established" argument by failing to raise it would make little sense.

I see no reason to depart from our usual practice here. Indeed, at this point, Russell's failure to raise a "clearly established" argument seems all but intended. Even though Russell overlooked this argument in his briefings below, the district court still addressed it and concluded that, under the circumstances, Russell violated X.M.'s clearly established Fourth Amendment rights by strip searching him and locking him in a room for twenty minutes. Russell chose not to contest that conclusion. Perhaps he did not want to argue that teachers can lock behaving students in a cell-like room for twenty minutes.

Or perhaps Russell chose not to raise a "clearly established" argument because existing caselaw would not support it. Although the majority opinion questions whether under our precedents, "the Fourth Amendment's guarantee against unreasonable seizures [even] applies in the public-school context," Maj. Op. at 11, our precedents are not as silent as it suggests. We have already held that "children are entitled to the Fourth Amendment's protections even when they are away from home and attending public school." *Schulkers v. Kammer*, 955 F.3d 520, 533 (6th Cir. 2020). We have explained that those protections include the right against "unreasonable searches and seizures." *Id.* (citation omitted). And we have recognized that state officers unreasonably seize a student when, without reasonable suspicion, they hold the student in "a room" with the door "shut" for "thirty minutes." *Id.* at 536–37. That *Schulkers* involved social workers and not teachers is immaterial, because we do not need to pinpoint "a case with near-identical facts" to determine that a rule is clearly established. *See Jackson-Gibson v. Beasley*, 118 F.4th 848, 858 (6th Cir. 2024). Thus, contrary to what today's decision may suggest, our precedents do not give state actors a roving license to seize students in the public-

school context. And setting aside the ultimate merits of this question, the point is that Russell never engaged with those merits by raising a "clearly established" argument.

Regardless of the strength of the argument that Russell did not, even under X.M.'s view of the facts, violate clearly established law, Russell did not make that argument—either before us or the district court. Russell appeals the district court's denial of qualified immunity based on nothing but his own disputed version of events. As *Johnson* makes clear, that is not enough to invoke our interlocutory jurisdiction.

## CONCLUSION

Because I would dismiss this appeal, I respectfully dissent.